[L. A. No. 6041. Department One.—February 14, 1921.]

## MARY E. MOONEY, Respondent, v. F. R. CYRIACKS, Appellant.

[1] SALES—WRITTEN CONTRACT FOR PURCHASE OF AUTOMOBILE—RESCISSION FOR FRAUD — PAROL EVIDENCE.—In an action to rescind a written agreement for the sale of an automobile on the ground of false representations made by the seller's agent, the plaintiff is not prevented from introducing parol evidence of the fraud by the recitals in the agreement that the machine is in present good condition as demonstrated, and that no representations have been made or exist other than those contained in the agreement.

[2] WRITTEN CONTRACT—MERGER OF ORAL NEGOTIATIONS—RESCISSION FOR FRAUD—RULE INAPPLICABLE.—In actions for rescission on the ground of fraud, the statutory provisions that when the terms of an agreement have been reduced to writing, it is to be considered as containing all of the terms (Code Civ. Proc., sec. 1856), and that the execution of a contract supersedes all prior negotiations or stipulations (Civ. Code, sec. 1625), do not control, and parol evidence is admissible to prove the fraud.

[3] SALE OF AUTOMOBILE—RELIANCE UPON FRAUDULENT REPRESENTATIONS—RECITAL IN WRITTEN CONTRACT—GOOD CONDITION OF CAR "AS DEMONSTRATED"—ABSENCE OF ESTOPPEL.—A purchaser under a written agreement for the sale of an automobile is not precluded from claiming reliance upon fraudulent representations made by the seller's agent as a ground of rescission because of the recital in the agreement that the car was in present good condition "as demonstrated," where she was inexperienced in automobiles, and after the car was first shown to her she sent it back immediately to have new seat covers put on, and on three occasions in the following week the purchaser's daughters were instructed in the operation of the machine.

[4] ID.—INDEPENDENT INVESTIGATION OF PURCHASER—INSUFFICIENCY OF EVIDENCE.—A purchaser of an automobile is not estopped from relying upon false representations made by the seller's agent, on the theory that she made an independent investigation, where she merely sent an automobile driver who had formerly dealt in automobiles to look the machine over and see if she had made a good purchase.

1. Showing of fraud essential to sustain action for rescission of executed contract, note, 1 Ann. Cas. 516.

Limitation on right to rescind fraudulent contract, note, 1 Ann. Cas. 910.

[5] ID.—MILEAGE OF AUTOMOBILE—VALUE OF EXTRA EQUIPMENT—STATE-MENTS OF FACT.—Representations made by a person experienced in automobiles to a purchaser uninformed and unskilled in the use, condition, and price of automobiles, as to the number of miles an automobile had been run and as to the value of extra equipment, are not mere expressions of opinion but statements of fact.

APPEAL from a judgment of the Superior Court of Los Angeles County. Russ Avery, Judge. Affirmed.

The facts are stated in the opinion of the court.

Frederick H. Griffith and Ernest C. Griffith for Appellant.

Perry F. Backus and Wm. J. Carr for Respondent.

LAWLOR, J.—This is an appeal by the defendant, F. R. Cyriacks, from a judgment in favor of plaintiff, Mary E. Mooney, in an action for the rescission of a written agreement of sale, on the ground of fraud, for the purchase and sale of an automobile, and to recover the sum of $532.15, alleged to have been paid out by plaintiff on account of said agreement of sale. The case was tried by the court sitting without a jury, and findings of fact and conclusions of law were made. A motion for a new trial was interposed and denied. The defendant appeals.

Respondent and appellant, the latter represented by J. H. Graves, his salesman, entered into a written agreement of sale which is dated August 20, 1918, whereby respondent agreed to purchase and appellant agreed to sell a Buick automobile for $1,835, of which five hundred dollars was paid on account, the balance of the purchase price remaining unpaid. Respondent also disbursed $26.75 for insurance premium on the car and $5.40 for a certificate of registration.

According to the testimony of respondent, she approached J. H. Graves about August 15, 1918, and stated she desired to buy a Buick automobile. On August 20th Graves called her on the telephone and said: "If you want to buy a car we have a wonderful bargain in a car, which is new, with the exception of 918 miles"; that Graves further told her that accessories to the value of $350 were on the car; that there were no more seven-passenger Buicks in Southern California for sale; "the company is not making any more now;

they are going into the employ of the government. . . . It is a great bargain''; that she "talked it over with a few people whom I thought would be good counsel, and I called Mr. Graves up again and asked him if he would bring the car to my house and let me see it, which he did.'' In the company of her three daughters she viewed the car and then said to Mr. Graves: "It looks very nice, but I know nothing about a car. If it drives well and looks well, that's all I know, and I have to depend entirely on you,'' to which Graves replied, "This is a fine car and it is in fine condition.'' Graves stated to her that appellant purchased the car from a young man who was called in the draft. Respondent concluded this conversation by saying, "If the car is as you represent it I will take it.'' Graves then went back to the shop with the automobile. Respondent continued:

"While we were talking to him I spoke about the top looking a little bit peculiar; all marked up. He said 'You know that could all happen coming over the desert. . . . ' And I said, 'I believe I'll have the seats covered; the leather don't look very nice. . . . ' We talked about the cost of that, and later he called me up and said it would be $85. I said I believed I would be willing to give that much and more; and I said, 'How soon can you have the car out?' He said, 'On Saturday afternoon. I will rush it through.' . . . The car was delivered Saturday afternoon about 4 o'clock.'' The seat covers had been put on and Graves called three times in the following week to teach respondent's daughters how to drive, and "within a day or two we went out for a ride and the car rattled and squeaked and the engine made so much noise I was really worried—I was afraid something was wrong, and I didn't know whether we would get home or not. We stopped at Mr. Cyriacks' store and I said to Mr. Cyriacks, 'This engine makes so much noise, and there are so many squawks I don't know what's the matter with it.' He said, 'All new cars do that, and after you ride a little while it will be all right; or maybe the engine needs a little greasing.' ''

Respondent said that her daughters told appellant the brakes would not work and he requested them to send the car over the next morning; that the car was sent to the shop several times for repairs, which did not prove satisfactory. "Within four days I found the car wasn't what it was

represented, and then was the time I saw Mr. Cyriacks himself. The time the car was left to have the brakes fixed, it was brought back within an hour or two by my daughter. Then he took it over to fix the curtains; kept it most all day, and then he brought it back and the curtains didn't fit then. Upon investigation of a very capable automobile man, the car was all wrong; it was not what it was represented to be at all.'' She testified she found the right front fender had been broken and repaired; that the top was composed of two or three different materials; that there was a hole in the top, the leather part, as large as a dime—a piece of leather had been pasted over it, which fell out when she pulled the braces a little bit; that the curtains did not fit; the front had been broken; that a part of the hood had been refinished; the tires on the car were all worn, worn smooth; that ''I found 'For Rent' and 'For Hire,' two different signs, like you see on cars on the street for hire, in the pocket, and two different guide-books of Los Angeles City and surrounding country; and a number of apartment houses. The hinge which was to support the lid to the rear seat-box, which raises, was broken off. The rear seat-box cover was all to pieces, and when you took it up the boards all fell in all directions. They were nothing but a bunch of slats. I noticed the speedometer at the time I first looked at the car. It registered 918 miles. There was a hole in the linoleum on the floor of the car. I called Mr. Graves' attention to it. After I saw these different things I called Mr. Graves up and told him I wanted to bring the car back; that it was not as represented; that it was not a new car, and I had found out many defects; and I said, 'I didn't ask you for a car that was used. You told me this was a new car, and it is not a new car.' He came down to the house and we went out to the car, and I pointed out these defects. I was very indignant, and he said, 'Well, we will do anything that is reasonable. We will put on a new running-board and fix the top.' He said they would do anything I wanted them to do. I said, 'I don't want you to do anything, because I don't want a car that is patched up. When I want a car I want a new car. I don't want one that I have to excuse to my friends about its appearance.' He said, 'We will do what we can about the car. I will tell Mr. Cyriacks.' I said, 'You tell Mr. Cyriacks I won't

have this car.' He went back and presently called me up and said, 'We will take that car back and put it in perfect running condition, and we will do anything that is within reason; but we won't give you back your money.' I said, 'All right, Mr. Graves, we will determine that later; but I won't have this car'; and that ended my conversation with him. My daughters were present while I was talking with him and when I was talking over the phone.

"I went to see Mr. Cyriacks on Thursday evening [August 29th]. My daughter was with me. I said to him: 'I want to know what you will do about this car Mr. Graves sold me.' He said, 'I don't know anything about the car.' I said, 'Do you mean to tell me that you allow cars to go out of your storeroom and don't know anything about them?' He said, 'I don't know anything about the car, I told you.' I said, 'Well, you simply have to know something about it, because,' I said, 'I won't be imposed on like this,' and Mr. Cyriacks said, 'I'll tell you what I'll do; I will talk this over with Mr. Graves, and you come back next Tuesday, Monday being Labor Day' [September 3d]. Tuesday morning at 11 o'clock I called at his request, and two of my daughters were with me. I said, 'Mr. Cyriacks, what do you intend to do about this car?' He said, 'I won't do anything. Mr. Graves has talked this case over with me and I find he has told you nothing that is not true.' I said, 'That is the stand you take?' He said, 'Yes, Mr. Graves has not misrepresented it.' I said, 'All right, Mr. Cyriacks, I will put this into the hands of my lawyers.' "

Ralph E. Ruble, an automobile driver who formerly dealt in automobiles, was called by respondent and testified that, accompanied by Mr. Graves, he visited the shop where the seat covers were being made for the car on "Friday or Saturday, August 23d or 24th"; that he went there at the instance of Mrs. Mooney. He told Graves he "had come down to look over the car that Mrs. Mooney was figuring on. . . . I looked at the car and said, 'Well, it looks pretty good. . . . The rubber seems to be pretty good . . . I mean the tires by that.' I said, 'It is a special top, isn't it?' He says, 'A different top from the top the car is equipped with from the factory.' . . . I looked at the speedometer and I think it had 948 miles on. . . . The linoleum on the floor was worn through to the wood. I think I made a remark

about it in my estimation nine thousand was better than nine hundred.''

This witness testified that after he had driven around in the car three or four blocks he said to Graves, " 'The machine seems to be in fair shape, mechanically.' He said, 'Yes; the car has been in our shop and gone all over.' " Ruble testified further that he told Graves the price of $1,750 "seems to be kind of high, doesn't it?" "I said, 'Has Mrs. Mooney bought the car?' He said, 'Yes, a substantial payment has been made.' 'Then,' I said, 'my report doesn't make any difference one way or the other.' He said, 'No, not necessarily.' " Ruble gave as his opinion that the car had run at least five thousand miles and that it is a simple matter to turn a speedometer back. He also made the report of his examination to Mrs. Mooney and told her he thought she was paying too much money for the car.

Within the next four days, Frank E. Wellens, salesman for the Howard Automobile Company, who had been an automobile mechanic for fifteen years, testified he "found the left front fender had been dented; it had been straightened and the right front fender was broken at the step of the running-board; the right rear fender was cracked. . . . The right rear hub-cap was badly dented; the molding on the right running-board was torn badly; there was a hole about the size of your little finger in the top over the center bow; the car squeaked and rattled, and No. 5 wrist-pin in the engine was loose. No. 3 cylinder's connecting rod was loose. I noticed that the boards, the slats that acted as a lid to the rear seat-box, were all shattered, all torn loose. The brake pedals showed as though they had been worn from long riding; and the floor board showed where the heel had worn, cut clear through the linoleum on the floor. The foot accelerator showed considerable wear. The tires had all been retreaded. The extra tire had gone about six thousand five hundred miles. In my opinion, from my examination, the car had been run since leaving the factory about ten thousand miles. The denting and straightening out of the fenders had been done before the car was refinished. . . . 'Q. What would you say at that time was the reasonable value of that car?' 'A. One thousand three hundred dollars.' "

This witness also testified that a new Buick of the same model and equipment as the car in question was worth $1,850 at that time.

Miss Mary Margaret Mooney corroborated the testimony of her mother as to the conversations between the latter and Graves and appellant.

J. H. Graves testified that he had known respondent since the middle of August; that the first time he met her "I told her it was a mighty good bargain; that the car had only been driven nine hundred miles and was in A-1 condition, and really in better condition than a new car, mechanically; . . . there was nothing that showed any wear on the car any more than could be worn in nine hundred miles— I mean except the tires.

"Q. Are you able to explain the condition of the tires?

"A. Yes; I talked quite a while with Smail, who owned the car; I think I was about the first one there, before Mr. Cyriacks saw it even; . . . The tires on the car at the time Mrs. Mooney bought it were not the same tires that it was equipped with at the factory. . . . I think it had been refinished, but don't know about the paint. . . . "

The witness testified to certain imperfections in the car, and continued: "I drove the car probably three or four times before selling it to Mrs. Mooney, about five or six miles. . . . I inspected the car in company with an expert on behalf of Mrs. Mooney, the expert [Ruble] that testified this morning. Mrs. Mooney told me he was sent down by her brother to inspect the car to see whether she made a good buy or not . . . "; that he told Ruble respondent had made a deposit on the machine and that she would take it unless his report was unfavorable; that he personally had handled ten second-hand cars a month during the preceding ten months, and that he had talked to appellant about the car the same day he saw respondent and went into it thoroughly with him.

Appellant testified to the condition of the machine and said further: "I know Mary E. Mooney, but didn't meet her at the time the car was sold. I am entirely familiar with the automobile my firm sold her. . . . In addition to my business of selling automobiles, I am by profession a mechanical engineer. At the time I bought that automobile,

I made an examination of it . . . looked the car over care-
fully, and found the car to be in A-1 condition. . . .

"Q. Will you state the value of that car at the time you
sold it to Mrs. Mooney?

"A. In the neighborhood of one thousand eight hundred
dollars. . . . I had a conversation with Mrs. Mooney on or
about the 1st of September, 1918. She said, 'There is some-
thing wrong about the car.' I said, 'If you will bring
the car back to-morrow, if there is anything to be done, we
will surely be pleased to fix it up. I will give the order to
my foreman to fix the car up, whatever needs to be done
to it.' . . . The next time I saw her, she said: 'There's some
things about the car that have been misrepresented to me.'
I said, 'I'm awful sorry that you take that view about it,
because I can't understand why you say that, because Mr.
Graves has been working for me a long time and he wouldn't
do that.' . . . The next time Mrs. Mooney came into the office
and asked me what I was going to do about it and I
said, 'Well, I would like to straighten out the matter for you,
but Mr. Graves has not misrepresented anything.' "

Under date of September 4th, respondent, through her
attorney, sent a written notice of rescission to appellant,
in which she demanded return of the five hundred dollars
paid on account of the agreement of sale, and stated his
agent, Graves, had, through fraud, deceit, and false repre-
sentations as to material facts concerning the age, usage, and
condition of the car, induced her to enter into the agree-
ment of sale; that the representations were false in fact and
known by Graves at the time to be false; that she relied
upon the truth of said representations and would not have
become a party to the agreement of sale in the absence
thereof, and that she had just discovered said fraud and
the falsity of said representations. Appellant's attorney,
under date of September 6th, in a written response to the
notice of rescission, stated that "apparently the communica-
tion is rigged up as the foundation for an action at law; but
you may rest assured that Mr. Cyriacks will not, for any
such reasons assigned, which are false and untrue, permit
your client . . . to repudiate her contract. I am satisfied
that if you gentlemen will investigate the matter further
the fact will develop that Mrs. Mooney has no grounds for
complaint. You may consider this as indicating definitely

Mr. Cyriacks' position and your course may be guided accordingly.''

On September 16th the car was returned by respondent to appellant, accompanied by the demand for the return of the five hundred dollars which she paid on August 24th, and a notice that unless it was refunded within three days an action would be brought to enforce payment. The complaint was filed on September 20th.

The court found, among other things, that on August 20, 1918, appellant represented to respondent the car was better than a new automobile of the same make and description; that said automobile had been run only 918 miles; that said automobile was worth in value more than three hundred dollars over and above the price of a new machine of the same make and style at said date; that said automobile was in perfect mechanical condition and was in all respects worth the sum of $1,835; that respondent was uninformed and unskilled in the use, condition, and price of automobiles, and had never driven or owned one theretofore, and that she informed appellant that she would rely solely upon the representations made to her by him and his agent in the matter of the purchase and sale of the automobile; that the representations were false and untrue and were known by the appellant to be false and untrue at the time they were made; that the payments made by respondent were made in reliance upon the said statements and representations, and that the said statements and representations were false and untrue at the time they were made to her; that within a reasonable time after August 20th respondent discovered that the representations and statements were false and untrue and that she thereupon returned to appellant the automobile and each and everything of value received by her from him and thereupon demanded of appellant the return of the five hundred dollars; and that appellant has failed, neglected, and refused to refund the said amount; that by reason of the false and fraudulent statements and representations respondent is damaged in the sum of five hundred dollars; that on August 20th the automobile had been run for more than five thousand miles; that within a reasonable time after discovering this, the respondent restored to appellant everything of value which she had received from him under the said agreement and that within

a reasonable time after the discovery of the falsity of the statements and representations made to her by appellant she rescinded the agreement of sale, and that by reason of such rescission appellant is indebted to respondent in the sum of $532.15.

Appellant urges four grounds for reversal of the judgment:

I.   The oral representations of appellant's agent were not competent or legally sufficient to vary the terms of the written agreement subsequently entered into, nor to bind appellant nor to sustain the findings.

II.   That the independent investigation made by plaintiff estops her from now attempting to say that she relied upon the representations made at the time of the purchase, when it is apparent from the evidence that she did not in fact rely upon them.

III.   There was no complete restoration, or offer thereof, upon the attempted rescission by plaintiff, and hence no rescission; and

IV.   The representations as to mileage and as to the value of the extra equipment constitute mere statements of opinion, and the defects claimed were not material.

## I.

The executory agreement of sale is in the usual form; it was dated August 20, 1918; time was made the essence of the agreement; plaintiff paid down five hundred dollars in addition to $32.15 for the license fee and insurance premium, and the balance—$1.335—was to be paid in monthly installments. On final payment being made appellant was to execute a bill of sale—respondent to have no interest in or title to the car until the full consideration was paid.

Under the first head, appellant quotes the following provisions of the agreement of sale:

"Property being a used Buick touring car, model E 49, motor number 438625, frame number 422422, in present good condition *as demonstrated*.

"It is expressly understood and agreed that no statements, agreements, understandings or representations of any kind or nature, have been made, or exist, other than those in this agreement contained."

[1]   As we understand this statement of appellant's first contention, it is that because the oral representations were

made by his agent, he is not bound by them; that the agreement of sale having been reduced to writing it is to be deemed to contain all the terms, and hence the writing itself is the only admissible evidence upon the issue of fraud, and that as the findings of fraud rest upon parol they cannot be upheld. As to the question of agency, it is sufficient to point out that the evidence we have set forth shows that Graves had full authority to negotiate the sale for his principal. When respondent first spoke to appellant about the car he said he knew nothing about it and that he would take up the matter with Graves. Appellant did not in his interviews with respondent take the position that Graves did not have complete authority to bind him in the transaction, nor did either appellant or Graves claim that she was foreclosed by the agreement of sale to rely upon the oral representations. It must be presumed that in the interval between Thursday, August 29th, and Tuesday, September 3d, when appellant canvassed with Graves the representations that he made to respondent, Graves detailed the facts of the transaction faithfully to him. In any event he did not disclaim responsibility for Graves' action in the premises, but passing on the merits of his version told respondent the car had not been misrepresented, and that while willing to put it into condition, he would not return the money. In view of the findings of fraud, which, as we shall presently show, are fully supported by the evidence, appellant will not now be heard to question the authority of Graves. As to the remaining contention, it is proper to mention that appellant made no objection to the admission of the oral evidence. The objection to its consideration is made for the first time on appeal. But apart from this, the contention ignores the well-established rule of law that "Parol evidence is always admissible to prove fraud." (Berry on Automobiles, sec. 814; Huddy on Automobiles, sec. 1059; Pomeroy's Equity Jurisprudence, 4th ed., sec. 858; Jones on Evidence, sec. 435; Smith on the Law of Fraud, sec. 265; Elliott on Contracts, secs. 1650, 1651; Civ. Code, secs. 1566–1568, 1572, 1709, 1710; *Johnson* v. *Powers*, 65 Cal. 179, [3 Pac. 625]; *Hick* v. *Thomas*, 90 Cal. 289, [27 Pac. 208, 376]; *Newman* v. *Smith*, 77 Cal. 22, [18 Pac. 791]; *Maxson* v. *Llewelyn*, 122 Cal. 195, 199, [54 Pac. 732]; *Langley* v. *Rodriguez*, 122 Cal. 581, [68 Am. St. Rep. 70, 55 Pac.

406]; *Hayes* v. *Gloster*, 88 Cal. 560, [26 Pac. 367]; *Tiffany* v. *Automobile Co.*, 168 Mo. App. 729, [154 S. W. 865]; *Case Threshing Machine Co.* v. *Webb* (Tex. Civ. App.), 181 S. W. 853; *Avery Co.* v. *Staples* (Tex. Civ. App.), 183 S. W. 43.) "Hence, the fact that the sale of an automobile is evidenced by a written contract, which recites that all conditions and representations are embodied therein, will not prevent the purchaser from proving by parol evidence that the sale was induced by fraud." (Berry on Automobiles, *supra;* Huddy on Automobiles, *supra;* 9 Ency. of Ev., 338; *Tiffany* v. *Automobile Co., supra; Case Threshing Machine Co.* v. *Webb, supra.*)

[2] It follows that in actions for rescission on the ground of fraud the statutory provisions that when the terms of an agreement have been reduced to writing, it is to be considered as containing all of the terms (Code Civ. Proc., sec. 1856), and that the execution of a contract supersedes all prior negotiations or stipulations (Civ. Code, sec. 1625), do not control. Appellant has cited certain authorities on this point: *Kullman, Salz Co.* v. *Sugar etc. Co.*, 153 Cal. 725, [96 Pac. 369], was an action for rescission based not on fraudulent representations, but on the alleged failure of a machine to meet the requirements of a warranty expressed in the written contract. This clearly is not in point. *Munn* v. *Anthony*, 36 Cal. App. 312, [171 Pac. 1082], was an action for damages. It was alleged by plaintiff that defendant made certain false representations touching the model number of the car, which indicated the year of manufacture. The trial court found in favor of plaintiff on this issue, and the finding was not disturbed on appeal. Two other points were considered in the appellate court—first, that plaintiff resorted to an independent investigation before purchasing the car, which point was declared to be without merit, and, second, that having finally entered into a written contract of sale containing, as here, a limiting clause, "the claim that false representations had been made by way of inducement could furnish no ground for a cause of action." The appellate court, referring to a limiting clause such as the one here, and citing section 1625 of the Civil Code, sustained the contention of the appellant notwithstanding the allegations and findings of fraud, and reversed the judgment, saying "it cannot be sustained because of the condition of

the contract by which plaintiff waived the representations made previous to the execution thereof.'' The vendee in that case elected to sue for damages under the contract for the alleged fraud, but so far as the question we are considering is concerned, the form of remedy is not material. The decision, therefore, is opposed to the authorities we have cited and hence cannot be followed.

The next authority upon which appellant relies is *Tockstein* v. *Pacific etc. Co.*, 33 Cal. App. 262, [164 Pac. 906]. It is, however, not in point. The alleged fraudulent misrepresentations in that case were as to what the seller (the defendant) would guarantee in respect to the car which was the subject of the sale. But the plaintiff actually bought the car under a written contract which did not contain these guaranties which it had been represented to the plaintiff would be made, and which also expressly provided that there were no guaranties other than those set forth. The case was one, therefore, where the alleged fraudulent misrepresentations went to the character of the contract which the plaintiff was to receive. She very evidently could not recover in such a case unless she had been deceived into accepting the contract which she did receive in lieu of that which she expected to receive, and this is all that the case decides. This is apparent from the following quotation: ''The plaintiff does not pretend to state that she did not sign these writings knowingly and freely, or that any fraud, deceit, or concealment as to their terms and effect existed as an inducing cause for her execution of them; nor has the plaintiff shown in the proofs in this case that any of the terms of the express and limited warranty of the manufacturer and seller of the car set forth in detail in the written agreement were violated by the defendant or by its principal, the Ford Motor Company.''

We shall next consider whether the evidence was sufficient to support the findings of fraud. Upon these findings we must assume the existence of every fact necessary to their support which the trial court might have inferred from the evidence. The testimony of respondent and her daughter as to the representations made by Graves is that the 918 miles which the machine had run improved its condition mechanically; that the addition of the accessories had increased the value of the car three hundred dollars over the

original price; that it was a wonderful bargain and a good buy; and that respondent told him she knew nothing about automobiles and would .rely entirely on him in the transaction. Appellant's answer was a general denial, but the testimony of respondent and her daughter that the above representations were made was not contradicted, and consequently the findings thereon cannot be questioned. And we think it is clear that the evidence is amply sufficient to sustain the findings as to the falsity of the representations upon which respondent relied. The testimony as to the car's mileage varied from five thousand to ten thousand miles, the finding being more than five thousand miles. It also appears that both Graves and appellant were well versed in automobiles; that the car had been in the shop for some time prior to this transaction; that when the machine first came in it was given a careful examination by appellant; that it had been revarnished, if not repainted; that the tires then on the automobile had run more than six thousand five hundred miles. The evidence is overwhelming that the car had greatly exceeded the mileage stated by Graves; for instance, Ruble remarking to him "nine thousand was better than nine hundred!" Ruble said Graves told him the machine had been gone all over before it was offered to respondent. After she received the car, it was repeatedly taken to the shop, apparently without any satisfactory results; it had been roughly handled; showed heavy wear and tear; and that it had been run out of condition. Appellant and Graves were dealing with a woman who was not versed in machines and yet she was induced by the latter to sign the agreement whose sole warranty is that the car was "in present good condition, as demonstrated"; and they endeavored afterward to reconcile her to the sale by promises to put it in shape. There would seem to be no escape from the conclusion that upon the evidence the findings that the representations were false and fraudulently made in order to induce respondent to enter into the agreement must be sustained.

[3] Appellant has italicized the words *"as demonstrated"* in the warranty we have just quoted. The car was first shown to respondent on August 20th, when it was sent to have the seat covers put on, and was returned to her on the 24th. On three occasions in the following week Graves

instructed respondent's daughters in the operation of the machine. Showing the car to the respondent on August 20th, and thereafter instructing her daughters, can hardly be called a demonstration, especially in view of the findings that respondent "was uninformed and unskilled in the use, condition, and price of automobiles," that the representations were fraudulent, and that respondent relied on them.

## II.

The next question is whether respondent made and relied upon an independent investigation and not on the oral representations in entering into the agreement of sale. This has reference to the visit made to the shop by Ruble with Graves to look over the automobile. There is some question whether this meeting occurred before or after the agreement was made. There is no finding on this point. The car was first shown to respondent on August 20th, the same day it was sent to have the seat covers put on. There is testimony that $50 was paid by respondent at that time, her daughter saying that it was on account of the seat covers. The purpose for which the $50 payment was made would not alter the situation for the reason that the seat covers were included in the purchase price of $1,835. Graves testified: "I don't remember the details, whether there was a $50 deposit and the balance of five hundred dollars was paid at the signing of the contract or not; anyway, the deposit and payment were made; . . . *the expert that examined the car for Mrs. Mooney came after she had made a deposit* [Italics ours]; . . . before Mrs. Mooney signed up the contract she had the seat covers put on." Ruble says that when he asked Graves whether respondent had bought the car the latter answered, "Yes; a substantial payment had been made." The indorsement on the agreement indicates that five hundred dollars was paid on August 24th, the day the car was returned. If two payments were made, it is not likely they were made at the same time, and it is fairly clear that the court reached the conclusion there were two payments, the first being made on August 20th.

We shall, however, consider the point on its merits. Appellant cites the following from ·section 892 of Pomeroy's Equity Jurisprudence as to the effect of an independent investigation:

"1. When before entering into a contract or other transaction he actually resorts to the proper means of ascertaining the truth and verifying the statement;

"2. When, having the opportunity of making such an examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence;

"3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties."

Referring to the first two paragraphs the author says:

"They are the ones which present by far the greatest practical difficulties in the administration of justice. If, after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, *and actually learns the real facts,* he cannot claim to have relied upon the misrepresentation and to have been misled by it." (Italics ours.)   This text is quoted approvingly in *Farnsworth* v. *Duffner*, 142 U. S. 43, [35 L. Ed. 931, 12 Sup. Ct. Rep. 164, see, also, Rose's U. S. Notes].

[4] The view of the court probably was that respondent asked Ruble to see the car in order to ascertain whether, as he put it, "she *had* made a good buy or not." It does not seem likely the court believed Ruble looked the car over for the purpose of enabling respondent to decide whether she would enter into the agreement, the italicized word "had" in his testimony suggesting that he thought the agreement was then in force. His judgment was plainly adverse, for he estimated that the car had run at least five thousand miles, and in his report to respondent he told her she was paying too much for the car. This is the only criticism he made to her. The court made no specific finding on this evidence, but in the state of the record the finding that respondent relied solely on Graves' representations is fully sustained. Taking this view of the evidence, it will not be necessary to consider the cases cited by appellant on this point.

### III.

Appellant claims that respondent failed to present any evidence on the issue of restoration raised by his general denial. This is not true. The witness Wellens testified that

he saw the car in Hollywood on September 16th, and "it was practically in the same condition as when I first saw it." September 16th was the day the machine was finally returned to appellant.

## IV.

[5]    Under this head appellant's claims are twofold—that the representations as to mileage and the value of the extra equipment were mere statements of opinion, and that the defects claimed were not material. The second proposition is sufficiently answered by what we have already said touching the general condition of the car. We cannot say from the evidence that the trial court did not conclude that every defect shown was material. Respondent was induced to buy a new car that was represented to have run 918 miles, which mileage, it was claimed, only improved its condition. As to the first proposition, it is idle to assert that the representations made by Graves were mere opinions and not statements of fact. From the tenor of his testimony respondent was justified in assuming that he was speaking from personal knowledge of the car's condition, or that he desired respondent to believe that he was. His statement to Ruble that "the car had been in our shop and gone all over," coupled with his knowledge of and experience with automobiles, put him in a position to speak advisedly as to the car, and to impress respondent with his statements concerning it. Moreover, appellant, by profession a mechanical engineer, testified that he was familiar with the car; that when he bought it he made a careful examination of it, and that the machine was in A-1 condition.

Judgment affirmed.

Shaw, J., and Olney, J., concurred.