588

[Civ. No. 26393. Second Dist., Div. One. Feb. 4, 1963.]

FRED F. KREIPL, Plaintiff and Appellant, v. THE PHILO-SOPHICAL RESEARCH SOCIETY, INC., Defendant and Respondent.

Robert J. Grossman for Plaintiff and Appellant.

Ervin, Cohen & Jessup, Charles W. P. Kamanski and Horace N. Freeman for Defendant and Respondent.

WOOD, P. J.—Action for damages for breach of contract. In a nonjury trial, the judgment was that plaintiff take nothing upon his complaint, and that defendant recover $2,000 upon its counterclaim. Plaintiff appeals from the judgment.

Appellant contends that the judgment was not supported by the evidence.

Plaintiff is an architect and general contractor. Defendant is a nonprofit corporation engaged in charitable, educational, and religious work.

On January 17, 1958, plaintiff and defendant entered into a written contract which provided: (in article 1) that plaintiff would furnish complete plans and specifications for, and would construct, an auditorium building for which the defendant would pay the total sum of $95,000; (in article 2) that the total contract sum shall be $95,000; (in article 3) that payments would be made as follows: at completion of the preliminary plans, $2,000; upon completion of working drawings and specifications, an additional $7,500, including a working capital of $2,000; at start of construction work, $10,000; during construction work, on the first of each month, such consecutive payments in amounts necessary to cover all labor and materials during such periods, but such amounts shall not be less than 20 per cent of the balance on the contract; the final balance shall be paid in accordance with article 5, subsections a, b, and c, of the contract (which article relates to substantial completion, notice of completion, etc.); that other than the $2,000 fee for the preliminary plans, the defendant shall be liable for "the balance of this Contract only" if a tentative loan commitment can be ob-

tained by defendant in the approximate amount of $60,000, which is the balance between available cash funds and the total contract cost; (in article 7) that the amount mentioned in article 2 "is a guaranteed maximum and shall be subject to adjustments at the time of completion of working drawings and specifications and when the final estimate figures are complied [compiled]." Other provisions in the contract relate to items not included in contract, changes in the work, insurance, and amounts which plaintiff would allow the defendant to apply on its selections of lighting fixtures, landscaping, and finish hardware, but it will not be necessary to state the details of those provisions.

The contract was prepared by plaintiff and, as above shown, provided that defendant would pay $2,000 when the preliminary plans were completed. It is to be noted also that $7,500, "including a working capital of $2000.00," was to be paid when the working plans and specifications were completed. This last provision was part of the basis for the controversy herein. Plaintiff asserts that the provision, "including a working capital of $2000.00," meant that $2,000 in addition to the $7,500 was to be paid at the time the working plans and specifications were completed. In other words, plaintiff asserts that defendant was required to pay $2,000 when the preliminary plans were completed, and to pay $7,500 and $2,000 when the working plans and specifications were completed—making a total of $11,500 as of the time when the working plans and specifications were completed. Defendant asserts that the last $2,000 item was included in the $7,500.

Defendant paid the first $2,000 referred to (when the preliminary plans were completed), and also paid the $7,500 (when the working plans and specifications were completed) but did not pay an additional $2,000.

It is also to be noted that in the first part of the contract (article 2) it is stated that the total contract price shall be $95,000, and that in the latter part of the contract (article 7) it is stated that the amount mentioned in article 2 ($95,000) "is a guaranteed maximum and shall be subject to adjustments" when the final estimate figures are compiled. This provision was also a part of the basis for the controversy herein. Defendant asserts that $95,000 was the maximum amount that might be charged, and that when the bids of subcontractors were received and it was determined therefrom what the cost of material and labor would be, there would be

an adjustment downward of the amount to be paid under the contract so that in effect it was a contract for cost plus 10 per cent or other percentage. Plaintiff asserts that the contract was for a fixed amount or "package deal" of $95,000, which might be adjusted upward if there were extras.

Plaintiff testified that the final plans and specifications were approved by the defendant on September 2, 1958, and that thereafter he was ready, willing, and able to proceed with the performance of the contract; that defendant requested him to help obtain finances, and he obtained two tentative loan commitments for $60,000 at 6 per cent interest, with a charge of 1.5 per cent for the broker; he notified defendant regarding the commitments; the defendant notified plaintiff by letter that it (defendant) had obtained a tentative loan commitment; the defendant never gave him permission to proceed with the construction of the building; the building was constructed by the Pozzo Construction Company, which used plaintiff's plans with minor modifications (a copy of the plans was obtained from the city building department); the contract was for a fixed amount of $95,000; he never told defendant that when the final estimates were compiled he would adjust the guaranteed maximum downward; and he never told defendant that the contract would be cost plus a percentage or cost plus a fixed fee; he determined the cost of constructing the building by obtaining bids from reliable subcontractors and making a material and labor analysis; the final figure for completing the building was $67,715.42, which amount includes the $9,500 which he had received; he is suing for $27,248.58 ($27,284.58) as damages for breach of contract—being the profit, or difference between $95,000 and $67,715.42.

On October 11, 1957, while the parties were negotiating relative to entering into a building contract, the plaintiff sent a letter to defendant which stated: "As we are members of the A.I.A., we would not be in a position to bid on a competitive basis, thereby interfering with the ethics of said Institute. However, we are able to construct the building for you under either of the following conditions, provided there are no competitive bids taken. (a) Cost plus a percentage. (b) Cost plus a fixed fee."

Mr. Drake, vice president of defendant, testified: That plaintiff, after writing said letter of October 11 relative to conditions under which he could make a contract, did not state

that he was mistaken as to those conditions and that he could enter into a contract for a fixed price. He (witness) explained to plaintiff that defendant was dependent upon gifts from friends and persons interested in defendant's activities, and that in order to secure pledges of money from such persons for the church auditorium, the representatives of defendant wanted to know the most that the auditorium could possibly cost. During the negotiations the plaintiff stated that the words, "guaranteed maximum subject to adjustment," meant adjustment downward. When the contract was submitted to defendant, a few days before it was executed, it did not contain the words, "including a working capital of $2000.00," which are now at the end of subsection b of article 3; but at that time the subsection ended with the words and figures, "the additional sum of ($7,500.00)." Also, when the contract was submitted, he told the plaintiff that since it was not probable that the building would cost more than $80,000 to $85,000, he felt that the $9,500 ($2,000 and $7,500) to be paid by defendant, as the contract then read, was too much and that some reduction should be made as to the $9,500. Then they agreed to add thereto the words, "$2,000 included for working capital." Thereafter, probably the following day, the plaintiff added, at the end of said subsection b, — after the figures "($7,500.00)," the words, "including a working capital of $2000.00." (As so changed, said subsection b provided that upon the completion of the working drawings and specifications the defendant would pay "the additional sum of ($7,500.00), including a working capital of $2000.00.") When the final working drawings and specifications were completed and were approved (September 2, 1958), the defendant asked plaintiff for a cost breakdown covering the project. That request was made in order to determine what the cost of the building would be, and in order to use it in obtaining a loan commitment. In reply to that request, the plaintiff said that the cost breakdown was not ready. After defendant had made several such requests, the plaintiff said that he would not show the cost breakdown to anyone. Finally, the plaintiff agreed to deposit a cost breakdown with the Bank of America, where a loan commitment was being considered; but the breakdown was not shown to the witness (Mr. Drake) at that time. Defendant's attorney wrote a letter to plaintiff requesting him to submit a cost breakdown, but no response was received. During 1958 the defendant

telephoned to three lending agencies with respect to obtaining loan commitments, but they were not interested in the matter.

Plaintiff testified further that after he had written the letter of October 11 (relative to conditions under which he could make a contract) he found out that his statement in the letter that he could not bid on a competitive basis was wrong; that he did not notify the defendant that his statement was wrong or that he could bid on a competitive basis and make a contract for a fixed price; he submitted a list of bids to the Bank of America, in connection with defendant's efforts to obtain a loan commitment, but the amounts of some of the bids on that list were in excess of the actual or true bids received by him; he adjusted some of the bids or estimates, in that manner, for the purpose of obtaining a maximum loan for defendant, and that is usual procedure in the building trade.

▆▆▆ Mr. Zohn, called as a witness by plaintiff, testified that he was business manager for plaintiff during 1957 and 1958; he was present at several of the preliminary meetings when the guaranteed maximum price was discussed; the representatives of the defendant said they were anxious to keep the guaranteed maximum as low as possible; the effect of the conversation was that plaintiff would guarantee a maximum figure beyond which he would not go; plaintiff said he could not construct the building for less than $95,000; when the contract was presented to the defendant the words, ''including a working capital of $2000.00,'' were in the contract; he indicated to plaintiff that the use of the word ''including'' was misleading in that it did not indicate that the amount was additional; he (witness) understood that the $2,000 was an additional amount to be paid; they discussed the phrase, ''subject to adjustments at the time of completion of working drawings and specifications and when the final estimate figures were compiled,'' but he (witness) did not remember what plaintiff said about it.

The court found: That the parties intended article 7, subsection a, to mean that $95,000 was not a fixed cost of the building, but was to be a guaranteed maximum cost, and that the actual cost to defendant was to be determined after plans and specifications had been approved by defendant and the city, and after all bids of subcontractors had been received, and plaintiff was to receive compensation on the basis of the reasonable value of his services. That it was the intent of

the parties that plaintiff be paid $7,500 as the reasonable value of his services in preparing all plans and specifications, and that plaintiff had been paid $7,500. Defendant advanced $2,000 as working capital and said amount was to be used only for such construction and after the plans and specifications had been approved, and after the parties had agreed as to the cost. The parties intended, in executing the contract, that plaintiff should furnish a cost breakdown to defendant in order that the parties might agree upon the final cost and upon the compensation of plaintiff, and in order to enable defendant to submit the true cost to a lending institution in the event such institution required knowledge of such cost as a condition to making a tentative loan commitment. Plaintiff refused within a reasonable time to furnish a true estimate or breakdown of the cost, and without such breakdown defendant could not secure a $60,000 tentative loan commitment. The breakdown that was furnished was a false statement of such costs, and plaintiff intended thereby to reap a greater profit than he was entitled to. The parties intended that the profit should not exceed 10 per cent of the difference between the cost of construction and the $7,500 paid for the plans and specifications. Plaintiff breached the contract. By reason of plaintiff's breach of the contract, he did not commence the construction, and that the $2,000 advanced by defendant as working capital belongs to defendant.

Appellant argues that the contract is one for a fixed price of $95,000, with a provision (article 16) for adjustment upward of the amounts for lighting fixtures, landscaping, and finish hardware. (Article 16 is to the effect that the plaintiff will allow the defendant to select lighting fixtures of the value of $1,000, landscaping of the value of $3,000, and finish hardware of the value of $500.) Appellant argues further that he was ready, willing, and able to perform the contract; that he presented adequate information to a bank to enable the defendant to obtain a loan commitment; that defendant did not cooperate with plaintiff nor arrange a meeting where such information could be delivered to defendant; there was no evidence of breach of contract by plaintiff; and there was no ambiguity in the contract which would justify the court in ruling that the contract was a cost-plus arrangement. As above shown, defendant presented evidence (testimony of Mr. Drake) that during preliminary negotiations the plaintiff stated in a letter that he was able to construct the building on

the basis of cost plus a percentage or cost plus a fixed fee, provided no competitive bids were taken; that he explained to plaintiff that since defendant was dependent upon gifts from friends in order to construct the building, the defendant's representatives wanted to know the maximum cost; that during the negotiations plaintiff said that the words, "guaranteed maximum subject to adjustment," meant adjustment downward.

The contract is ambiguous with respect to the contract price. At the beginning of the contract (articles 1 and 2) it is stated that the contract price was $95,000. About the middle of the contract (article 7) it is stated that the $95,000, mentioned in article 2, "is a guaranteed maximum and shall be subject to adjustments at the time of the completion of the working drawings and specifications and when the final estimate figures are compiled." Appellant (plaintiff) asserts in his brief that such provision relative to adjusting the maximum price meant that such price was subject to adjustment only by way of increase in the event the defendant selected lighting fixtures, landscaping, and hardware which exceeded in cost the allowances specified therefor in article 16. By reason of the above mentioned ambiguity in the contract, the court was justified in receiving parol and documentary evidence as an aid in interpreting the contract.

Another ambiguity in the contract is the portion relative to paying $2,000 when the preliminary plans were completed, and relative to paying "the additional sum of ($7,500.00), including a working capital of $2000.00," when the working drawings and specifications were completed. As above stated, plaintiff asserts that, under that portion of the contract, the defendant was required to pay $11,500—that the word "including" meant "in addition to." Defendant asserts that the last $2,000 item was included in the $7,500. Defendant presented evidence (testimony of Mr. Drake) that when the contract was first submitted to defendant, Mr. Drake told plaintiff that since it was not probable that the building would cost more than $80,000 to $85,000, he felt that the $9,500 (the $2,000 and $7,500 to be paid as the contract then read) was too much and should be reduced; that as a result of that discussion, the plaintiff added the words, "including a working capital of $2000.00," thereby causing that portion of the contract to read, "the additional sum of ($7,500.00), including a working capital of $2000.00." By

reason of this last mentioned ambiguity the court was justified further in receiving extrinsic evidence to explain the meaning of the contract.

Furthermore, it appears that the plaintiff did not object to the presentation of the evidence regarding statements made during the negotiations. Such an objection cannot be raised for the first time on appeal. (See *Pao Ch'en Lee* v. *Gregoriou*, 50 Cal.2d 502, 506 [326 P.2d 135].) It is to be noted also that plaintiff (without having objected to presentation of such evidence by defendant) cross-examined Mr. Drake regarding such evidence; and that plaintiff testified on redirect examination regarding it. Under the circumstances, it might properly be concluded that plaintiff impliedly waived an objection to the parol evidence. (See 3 Witkin, Cal. Procedure, pp. 2259-2260.) Where parol evidence has been received properly as an aid in interpreting a contract, and where such evidence is in conflict or is such that conflicting inferences may be drawn therefrom, a reviewing court will uphold, under the general rule of conflicting evidence, a reasonable intrepretation by the trial court. (See *Estate of Rule*, 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319]; *Brookes* v. *Adolph's Ltd.*, 170 Cal.App.2d 740, 746 [339 P.2d 879]; 3 Witkin, Cal. Procedure, p. 2253.)

The evidence was sufficient to support the findings that the parties intended article 7 of the contract to mean that $95,000 was not a fixed cost, but was to be a guaranteed maximum cost, and that the actual cost to defendant was to be determined after plans and specifications had been approved, and after all bids of subcontractors had been received, and plaintiff was to receive compensation on the basis of the reasonable value of his services.

The evidence also supports the findings regarding: the $7,500; the $2,000; the matters of agreeing to, and refusing to, furnish to defendant a cost breakdown; and breach of contract. It is not necessary to determine whether the finding regarding 10 per cent profit is supported by the evidence.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.