150 A.2d 617 (1959)
Harry A. FISHER, Plaintiff Below, Appellant,
v.
SAFE HARBOR REALTY COMPANY, a Delaware corporation, et al., Defendants Below, Appellee.
Supreme Court of Delaware.
April 1, 1959.
G. A. Peterson, Wilmington, for appellant.
Clyde M. England, Jr., Wilmington, for appellee Harry E. Patton.
Howard M. Berg, Wilmington, for appellee Edward H. Richardson Associates, Inc.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
WOLCOTT, Justice.
Harry A. Fisher, the plaintiff below and appellant here, and his associates (hereafter Fisher), on August 5, 1955, were the owners of all of the outstanding stock of *618 Safe Harbor Realty Co. (hereafter Safe Harbor), one of the defendants below and appellees here. The only asset of Safe Harbor was a tract of 312 acres of land located in Kent County and divided into 1500 building lots.
Prior to August 5, 1955, Joseph Scafetta and O. C. Westfield, defendants below and appellees here, negotiated with Fisher for the purchase of all of the stock of Safe Harbor, and on August 5, 1955 Scafetta received from Fisher an executed contract for the sale of Fisher's Safe Harbor stock.
Fisher, however, demanded more security for the payment of the purchase price and did not deliver the certificates of Safe Harbor stock. Accordingly, on August 23, 1955, Scafetta and Westfield delivered to Fisher an agreement executed by Safe Harbor which in effect guaranteed payment of the purchase price and performance of the conditions of the contract of August 5, 1955. Upon the receipt of Safe Harbor's guaranty, Fisher delivered the stock certificates of Safe Harbor to Scafetta and Westfield.
On December 12, 1955 Fisher caused the contract of sale and Safe Harbor's guaranty to be recorded in the office of the Recorder of Deeds at Dover as one instrument.
The contract of sale of August 5, 1955 was entered into between Fisher and his associates, designated as sellers, and O. C. Westfield, designated as purchaser. By the terms of this agreement Fisher agreed to sell 100% of Safe Harbor stock to Westfield, reciting the fact that Safe Harbor was the legal owner of the tract of land which, at that time, was unencumbered.
The stock was agreed to be sold for the total sum of $46,300 to be paid as follows: $500 paid previously as a deposit; $3000 on the signing of the contract; the delivery by Westfield to Fisher of his note in the amount of $1,500 payable 60 days from date; the construction upon other land of Fisher of a house described as a "Bryn Mawr House" within 30 days of the date of contract; the construction and sale of a "Wayne or Mainliner House" to net Fisher $9,500 by September 30, 1955; the construction and sale of one "Radnor, Cynwyd or Devon House" to net Fisher $8,500 by October 30, 1955; the construction and sale of one "Wayne or Mainliner House" to net Fisher $9,500 by November 30, 1955: and the construction and sale of one "Radnor, Cynwyd or Devon House" to net Fisher $8,500 by December 30, 1955.
The contract of sale contained a covenant by Westfield to bind himself, his associates and Safe Harbor "that the land owned by the company shall not be encumbered with or by mortgage so long as there are any amounts due" Fisher.
The other terms of the contract of sale are not pertinent to the questions before us.
Pursuant to the demand of Fisher for more security, the guaranty dated October 23, 1955 of Safe Harbor guaranteed "performance of O. C. Westfield of the conditions and obligations as set forth in contract of August 5, 1955", but made one change in the contract of sale, viz., the provision requiring the construction on other land of Fisher of one "Bryn Mawr House". This was changed to provide for the payment to Fisher in cash of the sum of $5,500 on the due date of the $1,500 Westfield note, upon the condition that at the time of payment Fisher would convey that additional land to Safe Harbor.
While the recited negotiations between Fisher, Scafetta and Westfield were going on, Scafetta and Westfield, representing themselves to be officers of Safe Harbor, on August 5, 1955 contracted with Edward H. Richardson Associates, Inc. for certain surveying work to be performed upon the tract of land owned by Safe Harbor. In addition, on August 5, 1955, Scafetta and Westfield, still representing themselves as officers of Safe Harbor, borrowed $3000 from Harry E. Patton, which sum was paid by his check made payable to Safe Harbor. *619 On August 12, 1955 Scafetta and Westfield delivered to Patton Safe Harbor's note in the amount of $3300. Subsequently, on April 26, 1956, Patton caused judgment to be entered on Safe Harbor's note.
By other proceedings commenced in the Superior Court of Kent County, Edward H. Richardson Associates, Inc. obtained a judgment against Safe Harbor in the amount of $2,821.70, representing moneys due for the surveying work performed on the land of Safe Harbor.
On September 17, 1956, Fisher commenced this action in the Court of Chancery of New Castle County, praying for cancellation of the contract dated August 5, 1955. On April 9, 1957, Safe Harbor, the sole defendant in the action at that time, agreeing thereto, an order was entered imposing an equitable lien on the land owned by Safe Harbor in favor of Fisher in the total amount of $42,800 effective as of December 12, 1955, the recording date of the instruments.
Patton caused execution against the property of Safe Harbor to be issued on his judgment resulting in the sale of the Safe Harbor land for the sum of $25,000. Ultimately, the proceeds of the execution sale were deposited with the Register of the Court of Chancery of New Castle County.
Patton and Richardson appeared in this cause and claimed a portion of the $25,000 deposit to pay off the judgments obtained by them against Safe Harbor.
By order of the Vice-Chancellor, $17,000 of said sum was paid to Fisher and the balance of $6,921.86 was ultimately ordered to be paid in satisfaction of the Patton and Richardson judgments on the ground that those judgments had priority over the equitable lien previously entered by order of the Vice-Chancellor. From this order, Fisher appeals.
Two fundamental questions are raised by Fisher. There are other subordinate questions, but our decision on the two basic ones will be dispositive of the subordinate ones.
First, Fisher argues that the judgments of Patton and Richardson were fraudulently obtained and thus may be collaterally attacked by Fisher in this proceeding.
Second, Fisher argues that the contract of sale of August 5, 1955 and the subsequent guaranty by Safe Harbor of August 23, 1955 constitute an equitable lien on the land of Safe Harbor, and that, by reason of the recording of those papers as one instrument, all subsequent creditors of Safe Harbor were put upon notice.
Two petitions alleging fraud in the obtaining of the judgments of Richardson and Patton are in the record before us. The gravamen of the petitions is that at the time the transactions were entered into between Scafetta and Westfield, purporting to represent Safe Harbor, and the present judgment creditors, Scafetta and Westfield were in fact not officers of Safe Harbor, had no interest in Safe Harbor and, consequently, perpetrated a fraud.
There is a short answer to this contention. Subsequently Scafetta and Westfield obtained ownership of Safe Harbor and were, as far as the record before us goes, duly elected officers of that corporation. Thereafter, by accepting the benefit of the agreements made by Scafetta and Westfield, the corporation ratified their acts. There is nothing, therefore, to the argument that the transactions are not binding on Safe Harbor.
The petitions fall short of alleging collusion between Scafetta, Westfield and the present judgment creditors. There is no charge that the judgment creditors knew that Scafetta and Westfield had no legal right to act for Safe Harbor at the time the commitments were made and collusively entered into the agreement in detriment of the rights of Fisher. The Vice-Chancellor was correct, therefore, in refusing to set aside, as fraudulently obtained, *620 the judgments in favor of Patton and Richardson.
The second contention of Fisher is that he has an equitable mortgage on the land of Safe Harbor created by the contracts. He then contends that he is entitled to the entire proceeds of sale of Safe Harbor's land for the reason that such lien relates back to the recording date of December 12, 1955, antecedent to the entry of the judgments of the judgment creditors.
The judgment creditors argue that the recording of the two instruments by Fisher was defective and amounted to no notice to subsequent creditors of Safe Harbor. In the view we take of the matter, however, we do not have to decide this minor point but will assume arguendo that the recording was in fact legal notice to subsequent creditors of Safe Harbor.
The contention of Fisher under this point is based on the covenant not to encumber Safe Harbor's land in the contract of August 5, 1955 quoted above. It will be noted that the particular provision is a negative covenant prohibiting the encumbering by mortgage of Safe Harbor's land.
We do not understand Fisher to argue that his equitable lien is the ancient vendor's lien long allowed in Courts of Equity in Great Britain. Nor, do we think he could so argue, because we have grave doubt that the vendor's lien is recognized in the law of Delaware. Cf. Budd v. Busti, 1 Har. 69; Godwin v. Collins, 3 Del.Ch. 189, 199; In re Tomlinson, 9 Del.Ch. 446, 81 A. 468, 585; and Rice v. Rice, 3 Cir., 36 F. 858, 859.
Fisher bases his contention squarely upon an express contract which he argues subjects Safe Harbor's land to a lien as security for the payment of the purchase price of Fisher's stock. He seeks to bring himself within the rule that any agreement in writing, however informal, made by an owner of land showing a clear intention to subject the land to security for the payment of money, creates a lien upon the land which will be enforced in a Court of Equity. 5 Tiffany, Real Property, §§ 1388, 1563; 4 Pomeroy's Equity Jurisprudence, § 1235; 33 Am.Jur., Liens, § 19. A so-called equitable lien arises, however, only when the intention to offer the land as security for the debt is clearly apparent. 4 Pomeroy's Equity Jurisprudence, § 1237.
We pass over the fact that neither Fisher nor Westfield, on August 5, 1955, was the owner of the land in question, and we will assume that the subsequent guaranty by Safe Harbor of the Westfield contract effectively put Safe Harbor in the same position it would have been in had it been an original party of the agreement of August 5, 1955.
We are of the opinion that the only provision in the contract which by the remotest possibility can be said to evince an intention to secure the purchase price with a lien on land is the covenant not to encumber the land by mortgage. As such, it is a negative covenant not to do a certain thing and not an unequivocal manifestation to secure a debt by a lien on land. Kelly v. Central Hanover Bank, D.C., 11 F.Supp. 497; Knott v. Shepherdstown Mfg. Co., 30 W.Va. 790, 5 S.E. 266; Kuppenheimer & Co. v. Mornin, 8 Cir., 78 F.2d 261; East Side Packing Co. v. Fahy Market, 2 Cir., 24 F.2d 644; Redemptorist Fathers of State of Washington v. Purdy, 174 Wash. 358, 24 P.2d 1089; Geddes v. Reeves Coal & Dock Co., 8 Cir., 20 F.2d 48, 54 A. L.R. 282.
We think, therefore, that the agreement before us evinces no intention to create a lien on the land of Safe Harbor as security for the payment of the purchase price of Fisher's Safe Harbor stock. In the absence, therefore, of an affirmative and unequivocal undertaking on the part of Safe Harbor to subject its lands to a lien, we must deny the imposition of an equitable lien to the detriment of subsequent judgment creditors.
For the foregoing reasons the order of the Vice-Chancellor is affirmed.