[Sac. No. 7857. In Bank. Feb. 5, 1971.]

TAHOE NATIONAL BANK, Plaintiff and Respondent, v.
BEULAH F. PHILLIPS, Defendant and Appellant.

**COUNSEL**

Paul E. Gervais for Defendant and Appellant.

Beverly & Riley and Melvin E. Beverly for Plaintiff and Respondent.

## OPINION

**TOBRINER, J.**—Defendant Beulah F. Phillips appeals from a judgment of the El Dorado County Superior Court that holds that an instrument entitled, "Assignment of Rents and Agreement Not to Sell or Encumber Real Property" (hereinafter referred to as "the assignment") was intended to be an equitable mortgage, and decrees its foreclosure.

We conclude that this judgment must be reversed. Plaintiff bank, which occupied the more powerful bargaining position and deliberately chose to use a standardized form providing for the assignment of rents and a covenant against conveyances, cannot be permitted to transform this assignment into a mortgage contrary to the reasonable expectation of its borrower. On examining the terms and purpose of the assignment, we conclude that it is not reasonably susceptible of construction as a mortgage at the instance of the bank, and thus that the trial court erred in invoking extrinsic evidence offered by the bank to prove it to be a mortgage.

Defendant and three co-venturers embarked on a real estate development in the Lake Tahoe area. About April 20, 1965, the venturers not only needed further capital but also owed plaintiff sums due on overdrafts on their accounts. Plaintiff agreed to lend $34,000 to defendant, who transferred the funds to the venture's account. In return, defendant gave plaintiff a single-payment promissory note, payable on demand or on May 20, 1965.[1] At the same time plaintiff executed and delivered to defendant an instrument entitled: "Assignment of Rents and Agreement Not to Sell or Encumber Real Property."[2] This document provided that

[1]The promissory note reads as follows: $34,000.00  Stateline California, April 20, 1965.  No. OT-516  "On Demand or if no demand then on May 20, 1965, for value received, the undersigned promise(s) to pay to the order of the TAHOE NATIONAL BANK, Stateline Office, the sum of Thirty Four Thousand and 00/100 Dollars with interest at the rate of 7% percent per annum from date until paid, interest payable at maturity and if not punctually paid, it shall become a part of the principal, and thereafter bear the same rate of interest as the principal debt; and should the interest not be paid when due, then the whole sum of principal and interest shall become immediately due and payable and may be charged to the account in said Bank of either the principal maker, or sureties on said note, at the option of the holder thereof. Should an attorney be employed to collect, or should suit be commenced to enforce the payment of this Note the undersigned agree(s) to pay a reasonable sum additional as attorney's fees; also costs of such suit. Principal and interest payable in lawful money of the United States. Should this note be signed by more than one person, and/or firm, and/or corporation, all covenants and obligations herein contained shall be considered for all purposes as joint and several covenants and obligations of each signer hereof. Renewed Nov 18 1965  Address P.O. Box 2612, Tahoe Valley, Calif. Beulah F. Phillips  Address Tahoe National Bank, Stateline, Calif. . . . Unsecured Single Payment Note Assignment on Record."

[2]The assignment reads as follows: "ASSIGNMENT OF RENTS AND AGREEMENT NOT TO SELL OR ENCUMBER REAL PROPERTY  In consideration and as security for a loan

as security for the loan defendant assigned to plaintiff all rent due from the realty described therein and agreed not to encumber or convey that property. The bank was authorized to record the instrument and did so on May 27, 1965.

The real property described in the document was not the venture's apartment development, but defendant's residence, which she owned one-half in fee and one-half as trustee under the testamentary trust of her deceased husband. This property was unencumbered as of April 20, 1965. On December 6 of that year defendant recorded a declaration of homestead on the property.

Mr. Ross, president of plaintiff bank, testified that the venturers first requested an unsecured loan but that he refused to issue the loan without security and requested collateral; that defendant then offered her residence as collateral and showed him an FHA appraisal at $34,400. The venturers required the money within two hours, and, for reasons which are not entirely clear,[3] Mr. Ross determined that the bank could not con-

---

made or purchased by TAHOE NATIONAL BANK (hereinafter called 'Bank') which loan is evidence[d] by a promissory note in favor of Beulah F. Phillips dated April 20, 1965, in the amount of Thirty Four Thousand and 00/100 ($34,000.00), the undersigned, and each of them, (hereinafter sometimes called 'Borrower') hereby covenant and agree with Bank as follows: 1. The real property referred to herein is located in County of El Dorado, State of California, and is described as follows: 'Lot 270, Tahoe Keys Unit No. 1, as said lot is shown on the Official Map of said Tahoe Keys Unit #1, filed in the office of the County Recorder of the County of El Dorado, State of California, on May 11, 1959, in Map Book C, Map No. 7. 2. Borrower hereby assigns to Bank all moneys due or to become due to Borrower as rental or otherwise for or on account of such real property, reserving unto Borrower the right to collect and retain any such moneys prior to Borrower's default under the terms of the loan described above; 3. Borrower will not create or permit any lien or any encumbrance (other than those presently existing) to exist on said real property and will not transfer, sell, assign or in any manner dispose of said real property or any interest therein without the prior written consent of Bank; 4. Bank is hereby authorized and permitted to cause this instrument to be recorded at such time and in such places as Bank at its option may elect. 5. This agreement is expressly intended for the benefit and protection of Bank and all subsequent holders of the note described above. Borrower warrants and represents that Borrower owns the above-described real property. 6. This agreement shall remain in full force and effect until the loan described above shall have been paid in full or until twenty-one (21) years following the death of the last survivor of the undersigned, whichever first occurs. Dated: April 20, 1965 (s) Beulah F. Phillips."

[3]Defendant's attorney inquired of Mr. Ross: "[W]ouldn't it have been just as easy to prepare a deed of trust on a form as an assignment of rents?" Mr. Ross answered: "No, it would not have been, simply because of the recording from the Tahoe Valley area into Placerville of the deed of trust with an amendment or new title policy showing our position if there had been a proper first deed of trust of record."

This answer of Mr. Ross is inconsistent with his assertion that the assignment was intended to be a mortgage on defendant's property. If the bank requires the protection

veniently prepare a trust deed within that time limit; consequently he selected instead a form for an assignment of rents and agreement against conveyances. The document was prepared by his secretary and executed by the parties.

Mr. Ross acknowledged that his bank and other banks make unsecured loans upon agreements by the debtor to maintain unencumbered assets of sufficient value in the county. He denied, however, that his purpose in having defendant sign the document in issue was merely to insure that she would have unencumbered assets reachable by the bank;[4] he maintained that he took the document "knowing it was in actuality a mortgage instrument against that house in lieu of a deed of trust."

Mrs. Phillips testified that she did not intend to sign or believe that she was signing any security interest "like a mortgage or deed of trust." She added that since she owned half her interest as trustee she believed that she lacked authority to execute a mortgage or trust deed on the property.

Plaintiff brought suit against the venture on various notes and overdrafts and, in its fifth cause of action, asked foreclosure of the assignment as an equitable mortgage. The court entered judgment against the venturers, jointly and severally, for $92,386 plus costs, interest, and attorney's fees. It further found that the assignment was an equitable mortgage securing $34,000 of the debt, and decreed its foreclosure.

Mrs. Phillips alone appealed; her appeal challenges only that portion of the judgment finding the assignment to be an equitable mortgage and ordering foreclosure.

1. *The language of the assignment is not reasonably susceptible of interpretation as a mortgage at the instance of plaintiff bank.*

We agree with defendant's contention that the assignment cannot reasonably be construed as a mortgage and thus that extrinsic evidence, offered by plaintiff to prove the document a mortgage, is legally irrelevant

---

of a title policy before executing a trust deed, and prompt recording of the trust deed, logically the bank should impose the same conditions on execution of an instrument intended to serve the purpose of a trust deed.

[4]On cross-examination of Mr. Ross, defendant's attorney inquired: "The [*sic*] isn't it true that the banks, many banks will loan on money as long as they know that their borrower maintains a certain worth or property situation in the county in which the bank is doing business?" Ross answered: "Speaking from my own banking, the banks that I have been associated with, yes."

and cannot support the judgment.[5] We shall examine the purpose and terms of the assignment, and explain that it is a type of agreement commonly used with unsecured loans, that it contains no words of hypothecation, and that it includes language inconsistent with a mortgage. We shall point out that if, as the bank contends, the word "security" in the assignment renders it ambiguous, the bank bears the responsibility for that ambiguity. ■ Having on hand instruments which unambiguously impose liens on realty, the bank cannot select an ambiguous instrument and then, by extrinsic evidence, give it the effect of the unambiguous form it eschewed.

Assignments similar to the present one are "used by many banks in conjunction with small, nominally unsecured loans such as home improvement loans." (California Real Estate Secured Transactions (Cont. Ed.Bar 1970) § 2.37 (hereinafter cited as "CEB").)[6] They provide the lender with a measure of security unavailable in a totally unsecured loan; the creditor holds an assignment of rents and a contractual guarantee that property in which the debtor has an equity will remain unencumbered and unconveyed, and thus available for levy and execution should the creditor reduce his debt to judgment. Indeed, the plaintiff bank com-

---

[5]"The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641]; accord, *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785].)

Defendant did not object at trial to the extrinsic evidence, and thus cannot posit error upon its receipt by the trial court. This failure to object, however, does not bar her from contending on appeal that the extrinsic evidence is irrelevant since the assignment is not reasonably susceptible of being construed as a mortgage. (See part 2 of this opinion.)

[6]A covenant against conveyances and encumbrances is sometimes referred to as a "negative pledge" agreement. (See G. Osborne, Mortgages (1951) § § 43-44; Coogan, Kripke, and Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements* (1965) 79 Harv.L.Rev. 229, 263-264; Comment (1965) 12 U.C.L.A. L.Rev. 954-962; but see CEB, § 2.37.) As summarized in the article by Coogan, Kripke, and Weiss: "The case law in this area is rather thin and in general dates from the depression. It indicates that a purely negative covenant creates no security interest in the property described." (79 Harv.L.Rev. at p. 264; see G. Osborne, *supra,* at § 44.) (See *B. Kuppenheimer & Co.* v. *Mornin* (8th Cir. 1935) 78 F.2d 261, 263-264 [101 A.L.R. 75]; *Kelly* v. *Central Hanover Bank & Trust Co.* (D.N.Y. 1935) 11 F.Supp. 497, 507, revd. on other grounds (2d Cir. 1936) 85 F.2d 61; *Fisher* v. *Safe Harbor Realty Co.* (1959) 38 Del.Ch. 297 [150 A.2d 617, 620]; *Western States Finance Co.* v. *Ruff* (1923) 108 Ore. 442 [215 P. 501, 504-505]; *Redemptorist Fathers of State of Wash.* v. *Purdy* (1933) 174 Wash. 326 [24 P.2d 1089, 1090]; *Knott* v. *Shepherdstown Manuf'g. Co.* (1888) 30 W.Va. 790 [5 S.E. 266, 269].)

monly makes loans upon the "security" of a promise by the debtor not to convey or hypothecate property, using for that purpose forms similar to that at issue here. (See fn. 4, *supra.*)

Thus we are not dealing with homemade security instruments in which the parties labor to produce a mortgage but fall short of the legal requirements and must be rescued by a court of equity.[7] The form used was carefully drafted to produce a security interest with incidents differing from that of a mortgage.[8] As Justice Friedman pointed out in his dissenting opinion in the Court of Appeal: "Here is a bank which prepared its own printed form, selected a particular one from its array of forms and handed it to the customer for signature. Doubtless the bank had printed forms of trust deed, perhaps even a few dusty, yellowed mortgages. Now the bank claims that by the printed form it selected, it intended to create the legal effect of a form it did not select." We conclude that the plaintiff, having selected a form for "assignment of rents and agreement not to sell or encumber real property," is bound by the terms of that agreement.

We turn now to the language of the assignment. Its title gives no hint of a power of foreclosure. It contains no language of hypothecation, no provisions imposing a lien or creating a mortgage, no discussion of foreclosure. (See cases cited in fn. 6, *supra.*) The substance of the document comprises six covenants by the borrower, none of which purport to give the bank a lien on real property. The covenants respecting recordation and duration of the agreement, and persons bound by its terms, are consistent with a mortgage, but they are equally consistent with an instrument designed to afford the bank the security that the borrower retains unencumbered assets. The third covenant, however, is inconsistent with an instrument creating a lien on real property. It provides in part that "borrower will not create or permit any lien or any encumbrance (other than those presently existing) to exist on said real property . . . without

---

[7]Compare *Estate of Pitts* (1933) 218 Cal. 184, 189 [22 P.2d 694]; *Bank of Suisun* v. *Fiske* (1924) 65 Cal.App. 771, 778 [225 P. 7].

[8]See CEB, § 2.37. Comment, *supra,* 12 U.C.L.A. L.Rev. 954, 962, 964, discusses the purpose of assignments such as that employed in the present case: "[L]enders are willing in some instances to advance credit on the basis of a long pay-off period to a person who appears to have property which may be attached or secured in case the debtor becomes in financial difficulty. However, when the property is transferred, the credit picture immediately shifts and the lender wants to be in a position to accelerate maturity at once; he is no longer willing to take the risk over the long pay-off period—a risk he would gladly take if the property remained 'locked' with the debtor."

The comment adds: "Even though the Financial Code prohibits savings banks and trust companies from securing their loans by taking second liens, lending institutions have made real estate loans to homeowners using the negative pledge agreement when the property specified in the agreement was already encumbered by a prior mortgage or trust deed on the theory that no security interest was created by the negative pledge agreement."

the prior written consent of bank." This language apparently assumes that the assignment itself is not an encumbrance; its absolute prohibition on what would be junior encumbrances is inappropriate in a mortgage,[9] and if in fact such a prohibition appeared in a mortgage it might be unlawful as an unreasonable restraint upon alienation. (See *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 317 [38 Cal.Rptr. 505, 392 P.2d 265].) On the other hand, as unsecured creditor the bank would benefit greatly from an assurance that defendant would not encumber her assets.

Plaintiff points out that the assignment specifies that it was given "as security for a loan," and that the word "security" may signify a right of foreclosure (see Civ. Code, § 2924; *Coast Bank* v. *Minderhout, supra,* 61 Cal.2d 311, 314). That phrase, however, appears in the preamble which, read as a whole, states that "as security for a loan . . . the undersigned . . . hereby covenant and agree with Bank as follows." The natural interpretation of this language is that it is the six covenants of the borrower that "secures" that loan;[10] that the word "security" in the preamble does not create additional rights and duties not specified in the covenants.

Plaintiff further contends that the term "security," and the provisions of the assignment describing the real property and permitting recordation, render the assignment ambiguous, thus requiring extrinsic evidence to determine whether it places a lien on defendant's property. (See *Coast Bank* v. *Minderhout, supra,* 61 Cal.2d at p. 315.)[11] If ambiguity there is, that ambiguity may be deliberate. Professor Hetland, referring to assignments similar to that at issue in the present case, states that "the instrument seems to have been designed by a group of lenders to afford the lender the option of being a secured or an unsecured creditor at the time of the debtor's default . . . ." (CEB, § 2.38.) Thus, although the assignment primarily serves to protect unsecured loans (see fn. 6, *supra*),

---

[9]A secured lender may protect against subsequent encumbrances by the borrower which may diminish the borrower's capacity to pay the loan by a clause making the debt due upon alienation of the property. (See CEB, § 4.55.) Neither the assignment nor the note in the present case contain "due-on-sale" provisions; the note provides for acceleration upon non-payment of interest installments, a meaningless provision since interest was payable only at maturity.

[10]Although the term "security" may denote a lien, it is also used in a broader sense; "whenever the performance of some undertaking is necessary to secure or preserve the value of some asset or other agreement, we could possibly refer to the undertaking as one that has been given 'as security.' " (*Greve* v. *Leger, Ltd.* (1966) 64 Cal.2d 853, 858 [52 Cal.Rptr. 9, 415 P.2d 824].)

[11]The promissory note carried the mark "OT." The bank argues that the meaning of this mark cannot be ascertained without extrinsic evidence, and that such evidence shows that "OT" means the note is secured by "other trusts." The bank, however, cannot create an ambiguity by the device of adding to the note a private code designation which is unexplained to the borrower.

it may also be used "[t]o lead a borrower who refuses to give a mortgage into believing he is not doing so" (CEB, § 2.25).

Since the alleged ambiguities appear in a standardized contract, drafted and selected by the bank, which occupies the superior bargaining position, those ambiguities must be interpreted against the bank.[12] The rule of resolving ambiguities against the drafter "does not serve as a mere tie-breaker; it rests upon fundamental considerations of policy." (*Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 871 [27 Cal. Rptr. 172, 377 P.2d 284].) Thus, in determining whether an instrument is reasonably susceptible to an interpretation suggested by the extrinsic evidence, one factor for consideration by the court is whether that interpretation would do violence to the principles of construing documents against the party who drafts and selects them.

In the present case, we conclude that to permit a creditor to choose an allegedly ambiguous form of agreement, and then by extrinsic evidence seek to give it the effect of a different and unambiguous form, would be to disregard totally the rules respecting interpretation of adhesion contracts, and to create an extreme danger of overreaching on the part of creditors with superior bargaining positions. The bank must bear the responsibility for the creation and use of the assignment it now claims is ambiguous; it is only "poetic justice" (CEB, § 2.38) if such ambiguity is construed in favor of the borrower.[18] Legal alchemy cannot convert an assignment into an equitable mortgage, violating the customer's reasonable expectation and bestowing upon the bank the riches of an hypothecation of title.

We recognize that in *Coast Bank* v. *Minderhout, supra,* 61 Cal.2d 311, we ordered foreclosure as an equitable mortgage of an instrument similar to the assignment in the present case, but we do not consider that case controlling. The agreement in *Coast Bank* contained an acceleration clause and stated that the loan was intended to improve the property described in the agreement—both characteristics indicative of a mortgage and both absent in the present assignment. Of greater significance is the differing context of *Coast Bank* and the present case. In *Coast Bank,* the borrower

---

[12]See, e.g., *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284]; *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1]; Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract* (1943) 43 Colum.L.Rev. 629.

[13]Usually it will be the lender who chooses an ambiguous instrument, but *Kogan* v. *Bergman* (1966) 244 Cal.App.2d 613 [53 Cal.Rptr. 371], was that rare case in which the borrower drafted an ambiguous security device. The court gave the creditor an election to enforce the note as a secured or an unsecured note. (244 Cal.App.2d at p. 621.)

had breached a covenant prohibiting conveyance of the realty. Such a breach confronts the court with a difficult problem in fashioning a remedy. An award of damages would prove ineffective; "[t]he maximum damages the bank could suffer from breach would be the amount of the debt, the same amount for which it could get a judgment on the note." (CEB, § 2.38.) Specific performance of the covenant against conveyances might create an invalid restraint against alienation. (See *Coast Bank* v. *Minderhout, supra,* 61 Cal.2d at p. 317.) Under these circumstances, enforcement as an equitable mortgage, which permits the property to be conveyed subject to the lien, is the only alternative to invalidation of the instrument. (See Comment, *supra,* 12 U.C.L.A. L.Rev. 954, 966-967.)

In the present case defendant has performed all terms of the assignment,[14] with the result that defendant's interest in the realty, over the homestead exemption, is available to satisfy the bank's judgment on the note. If this security is not fully adequate, such is the result of the bank's choice of the governing instrument.

*2. Defendant's failure to object to extrinsic evidence at trial does not bar her from contending on appeal that the instrument is not fairly susceptible of interpretation as a mortgage.*

We turn now to plaintiff's contention that since defendant did not object at trial to plaintiff's extrinsic evidence intended to show that the assignment was a mortgage, she is precluded from arguing on appeal that the assignment is not reasonably susceptible of that construction. To support its contention plaintiff relies on *Pao Ch'en Lee* v. *Gregoriou* (1958) 50 Cal.2d 502, 506 [326 P.2d 135], in which we held that "the admission of parol evidence to vary or add to a written instrument cannot be objected to for the first time in the appellate court."[15]

---

[14]The declaration of homestead by defendant did not breach her covenant against encumbering or conveying the property. "[A] homestead right is not an estate in the land, but a mere privilege of exemption from execution of such estate as the holder occupies." (*Arighi* v. *Rule & Sons, Inc.* (1940) 41 Cal.App.2d 852, 855 [107 P.2d 970]; *Holmes* v. *Grange etc. Fire Ins. Assn.* (1951) 102 Cal.App.2d 911, 917 [228 P.2d 889].) It is not a conveyance (see *Ontario State Bank* v. *Gerry* (1891) 91 Cal. 94, 97 [27 P. 531]); it transfers no title or interest in the property (see *Holmes* v. *Grange etc. Fire Ins. Assn., supra,* 102 Cal.App.2d 911). "[A]n encumbrance, within the meaning of a covenant . . . [against encumbrances] had been defined as 'any right to or interest in land which may subsist in third persons to the diminution of the value of the estate to the tenant, but consistently with the passing of the fee.' " (*Fraser* v. *Bentel* (1911) 161 Cal. 390, 394 [119 P. 509].) The filing of a declaration of homestead creates no rights in third persons, and does not diminish the title of the declarant; it cannot be encompassed within the definition of an encumbrance.

[15]Prior to *Pao Ch'en Lee* v. *Gregoriou, supra,* 50 Cal.2d 502, 12 California cases (and one federal case applying California law) had taken the position that parol

Developments in the law of parol evidence since 1958, however, require a modification of the approach of *Pao Ch'en Lee*. ▮ Recent decisions make clear that, in most cases, extrinsic evidence must be admitted provisionally in order that the court may determine if that evidence is relevant to establish an interpretation of the instrument to which it is reasonably susceptible. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.*, *supra,* 69 Cal.2d 33, 40; *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785].) ▮ Moreover, "[t]he parol evidence rule, as is now universally recognized, is not a rule of evidence but one of substantive law. It does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. . . . Extrinsic evidence

evidence erroneously admitted, but without objection, should be ignored on appeal and could not constitute substantial evidence in support of a judgment. (*Smith* v. *Bear* (2d Cir. 1956) 237 F.2d 79, 84 [60 A.L.R.2d 1119]; *Harding* v. *Robinson* (1917) 175 Cal. 534, 540 [166 P. 808]; *Pinsky* v. *Sloat* (1955) 130 Cal.App.2d 579, 589 [279 P.2d 584] (may be dictum); *El Zarape etc. Factory* v. *Plant Food Corp.* (1949) 90 Cal.App.2d 336, 344 [203 P.2d 13]; *Love* v. *Gulyas* (1948) 87 Cal.App.2d 608, 614 [197 P.2d 405] (dictum); *Lifton* v. *Harshman* (1947) 80 Cal.App.2d 422, 432 [182 P.2d 222]; *Mulrooney* v. *Pietro* (1947) 79 Cal.App.2d 311, 314 [180 P.2d 62]; *Gore* v. *Bingaman* (1938) 29 Cal.App.2d 460, 479 [85 P.2d 172]; *Hanrahan-Wilcox Corp.* v. *Jenison M. Co.* (1937) 23 Cal.App.2d 642, 645 [73 P.2d 1241]; *Middlecamp* v. *Zumwalt* (1929) 100 Cal.App. 715, 733 [280 P. 1003]; *Rottman* v. *Hevener* (1921) 54 Cal.App. 474, 479 [202 P. 329]; *Dollar* v. *International Banking Corp.* (1910) 13 Cal.App. 331, 343 [109 P. 499].)

Thirteen cases took a contrary position, but most of these are dictum; none is more recent than 1942. (*Jacoby* v. *Wolff* (1926) 198 Cal. 667, 676 [247 P. 195] (invited error); *Mooney* v. *Cyriacks* (1921) 185 Cal. 70, 80 [195 P. 922] (dictum); *McCombs* v. *Church* (1919) 180 Cal. 233, 237 [180 P. 535] (dictum); *Le Mesnager* v. *Hamilton* (1899) 101 Cal. 532, 539-540 [35 P. 1054]; *Tebbs* v. *Weatherwax* (1863) 23 Cal. 58, 60; *Graham* v. *Smither* (1942) 53 Cal.App.2d 701, 706 [127 P.2d 1024] (dictum); *Palm* v. *Smither* (1942) 52 Cal.App.2d 500, 507 [126 P.2d 428] (dictum); *Bonner* v. *Finney* (1930) 110 Cal.App. 518, 521-522 [294 P. 466] (dictum); *Tennant* v. *Wilde* (1929) 98 Cal.App. 437, 441-442 [277 P. 137] (dictum); *Anthony* v. *Crocker First Nat. Bank* (1928) 95 Cal.App. 347, 350 [272 P. 767] (dictum); *Inner Shoe Tire Co.* v. *Tondro* (1927) 83 Cal.App. 689, 693 [257 P. 211]; *Caine* v. *Polkinghorn* (1921) 54 Cal.App. 387, 390 [201 P. 936]; *McComish* v. *Kaufman* (1919) 43 Cal.App. 507, 510 [185 P. 476].)

Since *Pao Ch'en Lee* most Court of Appeal cases have followed that decision and held that failure to object at trial to parol evidence bars that argument on appeal. (*Crummer* v. *Zalk* (1967) 248 Cal.App.2d 794, 797 [57 Cal.Rptr. 185]; *Martin* v. *Town & Country Development* (1964) 230 Cal.App.2d 422, 427 [41 Cal.Rptr. 47, 10 A.L.R.3d 1347]; *Calabrese* v. *Rexall Drug & Chemical Co.* (1963) 218 Cal.App.2d 774, 780-781 [32 Cal.Rptr. 665]; *Santa Clara Properties Co.* v. *R.L.C., Inc.* (1963) 217 Cal.App.2d 840, 850 [32 Cal.Rptr. 333]; *Kreipl* v. *Philosophical Research Soc., Inc.* (1963) 212 Cal.App.2d 588, 596 [28 Cal.Rptr. 323]; *Wilson* v. *Anderson* (1962) 208 Cal.App.2d 62, 64 [25 Cal.Rptr. 105]; *Collins* v. *Home Sav. & Loan Assn.* (1962) 205 Cal.App.2d 86 [22 Cal.Rptr. 817]; *Ferrara* v. *La Sala* (1960) 186 Cal.App.2d 263, 268-269 [9 Cal.Rptr. 179]; *Tsarnas* v. *Bailey* (1960) 179 Cal.App.2d 332, 338 [3 Cal.Rptr. 629].) *Youngblood* v. *Silvagni* (1959) 173 Cal.App.2d 731, 743 [343 P.2d 951], although decided after *Pao Ch'en Lee,* permitted challenge to the evidence on appeal.

is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself." (*Estate of Gaines* (1940) 15 Cal.2d 255, 264-265 [100 P.2d 1055].)[16] Thus the Legislature, when it enacted the Evidence Code in 1965, excluded from it the subject of parol evidence. (See Witkin, Cal. Evidence (2d ed. 1966) § 714.)

▉ If we treat the parol evidence rule as one of substantive law, we cannot consistently subjugate that rule to the principles of objection and waiver codified in the Evidence Code. (Evid. Code, § 353.) ▉ To be sure, a party who has not objected to the introduction of extrinsic evidence cannot complain if that evidence is considered by the trier of fact. But in determining whether substantial evidence supports a judgment, extrinsic evidence inconsistent with any interpretation to which the instrument is reasonably susceptible becomes irrelevant;[17] as a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. Irrelevant evidence cannot support a judgment. (*Kitchel* v. *Acree* (1963) 216 Cal.App.2d 119, 124 [30 Cal.Rptr. 714].)[18]

▉ We conclude that defendant, having not objected at trial, cannot now take exception to the trial court's receipt of extrinsic evidence, but

[16]Accord: *Hale* v. *Bohannon* (1952) 38 Cal.2d 458, 465 [241 P.2d 4]; 3 Corbin, Contracts, § 573; McCormick, Evidence, p. 433; Witkin, Cal. Evidence (2d ed. 1966) § 715. Twenty-three other California decisions hold the parol evidence rule to be one of substantive law, and one case, *Bank of America etc. Assn.* v. *Pendergrass* (1935) 4 Cal.2d 258, 264 [48 P.2d 659], refers to it as both a rule of evidence and of substantive law. No decisions treat the rule as one of evidence only.

[17]Generally, points not urged in the trial court cannot be raised on appeal. (See, e.g., *Damiani* v. *Albert* (1957) 48 Cal.2d 15, 18 [306 P.2d 780].) The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule.

[18]Professor Corbin, analyzing *Pao Ch'en Lee* v. *Gregoriou, supra,* 50 Cal.2d 502, states that: "Evidence having been admitted without objection, it was not error to admit it. But the legal operation of the facts proved by such evidence is a matter for the consideration of the appellate court, just as in the case of facts proved by other evidence. If the facts so proved show that the parties agreed upon a writing as a complete and accurate 'integration,' the substantive law of contracts declares that prior inconsistent negotiations and agreements are no longer operative. If the facts so proved show no such agreement, the prior agreements have continued operation." (3 Corbin, Contracts (1964 Supp.) p. 179.)

Professor Edmund Morgan notes that: "The decisions are now overwhelmingly in accord with the doctrine of the Restatement that the rule is fundamentally a rule of substantive law. It declares specified conduct of the parties to be without legal effect with respect to their later conduct; the earlier conduct is inoperative to add to or vary the later writing. Consequently, any evidence offered to prove the earlier conduct is irrelevant. And the one rule of evidence to which there is no exception is that irrelevant evidence is inadmissible." (Morgan, Basic Problems of Evidence (1962 ed.) p. 399; see also 4 Williston, Contracts (3d ed. 1961) §§ 961, 963.)

that she may argue on appeal that such extrinsic evidence conflicts with any interpretation to which the instrument is reasonably susceptible.

### 3. *Conclusion.*

■ Part 2 of the superior court judgment, the only portion of that judgment from which defendant appeals, held that the assignment was an equitable mortgage and ordered foreclosure. We conclude that this determination is in error; the assignment cannot reasonably be construed as a mortgage at the instance of the party who drafted and selected it.

Part 2 of the judgment against defendant Beulah Phillips is reversed.

Wright, C. J., McComb, J., Peters, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.**—I dissent.

The sole issue before us on this appeal is whether the evidence is sufficient to support the trial court's finding[1] that the Assignment was intended by the parties to make defendant Beulah F. Phillips' real property security for her indebtedness to the plaintiff bank.[2] It is beyond dispute that this crucial finding has ample support in the record and that the trial court's resultant conclusion that the Assignment was an equitable mortgage must be sustained.[3] I can find no merit in the majority's elaborate disquisition which attempts to avoid a straightforward confrontation with the issue before us and to elude the settled principles of appellate review.

Our inquiry as to the sufficiency of the evidence in this case centers upon

---

[1] The trial court found: "That on April 20, 1965, when defendant BEULAH F. PHILLIPS made and delivered to plaintiff the document entitled 'Assignment of Rents and Agreement not to Sell or Encumber Real Property (See finding No. 6), it was the intent of the parties that said instrument was to make the interest of defendant BEULAH F. PHILLIPS in real property therein described, security for the indebtedness of defendant BEULAH F. PHILLIPS to plaintiff consisting of a promissory note in the sum of THIRTY FOUR THOUSAND DOLLARS ($34,000.00)."

The court concluded: "That the entitled document 'Assignment of Rents and Agreement not to Sell or Encumber Real Property' is an equitable mortgage under which plaintiff is entitled to a judgment of foreclosure as follows: . . ."

[2] As the court found (see fn. 1, *ante*), Mrs. Phillips' indebtedness was evidenced by a promissory note dated April 20, 1965 in the sum of $34,000. The note was signed by Beulah F. Phillips and bore the hand-printed notation "Assignment on Record." Thereafter, Mrs. Phillips and her associates incurred an additional indebtedness to the bank and on November 17, 1965 all seven of them executed and delivered to plaintiff a renewal note in the sum of $50,000. Their signatures appear under the typed name "Angers, Cole, Herron & Phillips." This note also bore the hand-printed notation "Assignment on Record."

[3] It should be noted that although plaintiff obtained judgment against all defendants, only defendant Beulah F. Phillips has appealed. Hereafter, unless otherwise indicated, our reference to "defendant" is intended to mean defendant and appellant Phillips.

that facet of the parol evidence rule which deals with the admissibility of extrinsic evidence to interpret an integration. I start, therefore, with the principles recently enunciated by this court in *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641] and *Delta Dynamics, Inc. v. Arioto* (1968) 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785]. In *Thomas Drayage,* we said: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]" (69 Cal.2d at p. 37.) "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms." (*Id.* at p. 39.) "Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (Fns. omitted.) (*Id.* at pp. 39-40.) (See, also, *Delta Dynamics, Inc. v. Arioto, supra,* 69 Cal.2d 525, 528.)

The case at bench was tried and judgment entered well before we announced the above-quoted principles in *Thomas Drayage.* Hence, the trial court did not have the opportunity of following the procedure prescribed by *Thomas Drayage,* that is by first considering provisionally all credible evidence offered to prove the intention of the parties and then deciding whether the offered evidence was relevant to prove a meaning of which the language of the Assignment was reasonably susceptible. Indeed, all of the extrinsic evidence offered by plaintiff bank was admitted without any objection by defendants.

Putting this last circumstance to one side, the majority contend that the extrinsic evidence is entirely irrelevant and therefore furnishes no support whatsoever to the judgment below. To expose the utter lack of merit in this contention we need only make the same determination with respect

to the extrinsic evidence that would now be required of a trial court under *Thomas Drayage*. Thus, we must determine on the basis of "all credible evidence offered to prove the intention of the parties" whether the Assignment "in the light of all the circumstances" is fairly susceptible of the interpretation urged by plaintiff and accepted by the trial court. (69 Cal.2d at pp. 39-40.) Under *Thomas Drayage* we must consider the extrinsic evidence as well as the Assignment itself in making this determination.[4] This indispensable task, the majority ignore.

I thus turn to the extrinsic evidence. Ross, plaintiff's president, testified as to the circumstances under which the loan, secured by the Assignment, was made. He stated that defendant Charles Herron, a joint venturer with defendant Mrs. Phillips (see fn. 2, *ante*), telephoned him and said that the joint venture needed an immediate loan in order to close an escrow covering the purchase by the joint venture of real property on which it planned to construct the second of its apartment units. According to Ross, Herron suggested that the loan be unsecured, but Ross refused to make a loan on that basis. Ross further testified that soon thereafter both Herron and Mrs. Phillips telephoned him again, reiterating the urgency of the loan. After some discussion and Ross' repeated demand for collateral, it was agreed that Mrs. Phillips would put up her house as collateral for the loan.

According to Ross, the Assignment form was used rather than an ordinary deed of trust form because the latter could not have been prepared, recorded and covered by an appropriate title insurance policy within the two-hour period left before the escrow was to be closed. He testified that based on the FHA appraisal of the property, Mrs. Phillips' statements, and their previous relationship, he "took the agreement [not] to encumber knowing it was in actuality a mortgage instrument against the house in lieu of the deed of trust."

Ross' testimony, though partially contradicted by defendant, was strong evidence that the parties intended that the Assignment would make her property security for the loan. Ross' testimony amply supports the conclusion that the Assignment was reasonably susceptible, in light of the intention of the parties and all the circumstances, of the interpretation shown by the extrinsic evidence and accepted by the trial court.

Moreover, the provisions of the Assignment itself show, as we held in *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311 [38 Cal.Rptr. 505, 392 P.2d 265], that the Assignment could reasonably have been interpreted as creating a security interest and giving rise to an equitable mortgage.

---

[4]The provisions of the promissory note (see fn. 11 of the majority opinion) are not relevant to this determination since we are concerned with extrinsic evidence admissible to construe the Assignment, not the promissory note.

In *Coast Bank* the defendant appealed from a judgment of foreclosure after he had failed to answer the complaint. At issue was whether an instrument nearly identical to the Assignment[5] had created an equitable mortgage.

[5]The provisions of the two instruments are set forth side by side for comparison. The order of the provisions of the Assignment has been changed to facilitate the comparison but the original paragraph numbers have been retained.

*Coast Bank Instrument*
"ASSIGNMENT NOT TO ENCUMBER OR TRANSFER PROPERTY
"(For use with Property Improvement Loan)

"In consideration of any loan or advance made by Bank of Belmont Shore (hereinafter referred to as 'Bank') to the undersigned, either jointly or severally, the undersigned (hereinafter referred to as 'Borrower' whether one or more), jointly and severally promise and agree

that until all such loans and advances and all other indebtedness or liabilities to the Bank shall have been paid in full, or until 21 years following the death of the last survivor of the undersigned, whichever shall first occur,

they will pay all taxes, assessments and charges of every kind, imposed or levied, or which may be imposed or levied upon the hereinafter described real property prior to the time when any of such taxes, assessments or charges shall become delinquent

and will not, without the consent in writing of Bank, first had and obtained, create or permit any lien or other encumbrances (other than those presently existing and/or securing the payment of loans and advances made to them by Bank) to exist on said real property, and will not transfer, sell, hypothecate, assign, or in any manner whatever dispose of said real property, or any interest therein or any portion thereof,

*Tahoe National Bank Instrument*
"ASSIGNMENT OF RENTS AND AGREEMENT NOT TO SELL OR ENCUMBER REAL PROPERTY

"In consideration and as security for a loan made or purchased by TAHOE NATIONAL BANK (hereinafter called 'Bank') which loan is evidenced by a promissory note in favor of Beulah F. Phillips dated April 20, 1965, in the amount of Thirty Four Thousand and 00/100 ($34,000.00), the undersigned and each of them, (hereinafter sometimes called 'Borrower') hereby covenant and agree with Bank as follows:

6. This agreement shall remain in full force and effect until the loan described above shall have been paid in full or until twenty-one (21) years following the death of the last survivor of the undersigned, whichever first occurs.

3. Borrower will not create or permit any lien or any encumbrance (other than those presently existing) to exist on said real property and will not transfer, sell, assign or in any manner dispose of said real property or any interest therein without the prior written consent of Bank;

As this court unanimously held: "An agreement that particular property is security for a debt also gives rise to an equitable mortgage even though it does not constitute a legal mortgage." (*Coast Bank* v. *Minderhout, supra,* 61 Cal.2d 311, 314.) "Specific mention of a security interest is unnecessary if it otherwise appears that the parties intended to create such an interest." (*Id.* at p. 314.) "In the present case, however, plaintiff pleaded and defendants admitted by demurring and failing to answer that the parties intended to create a security interest in the property. Accordingly, the question presented is not what meaning appears from the face of the instrument

which real property is situated in *San Luis Obispo* County, California. . . . [Description omitted.]

"It is further agreed and understood that if default be made in the performance of any of the terms hereof, or of any Instrument executed by Borrower in connection herewith, or in the payment of any indebtedness or liabilities now or hereafter owing to Bank, Bank may, at its election, in addition to all other remedies and rights which it may have by law, declare the entire remaining unpaid principal and interest of any obligations or indebtedness then remaining unpaid to the Bank due and payable forthwith.

"It is further agreed and understood that Bank may, in its discretion, and is hereby authorized by Borrower, to cause this instrument to be recorded at such time and in such places as Bank may, in its discretion, elect."

1. The real property referred to herein is located in County of El Dorado, State of California, and is described as follows: [Description omitted.]

4. Bank is hereby authorized and permitted to cause this instrument to be recorded at such time and in such places as Bank at its option may elect.

2. Borrower hereby assigns to Bank all moneys due or to become due to Borrower as rental or otherwise for or on account of such real property, reserving unto Borrower the right to collect and retain any such moneys prior to Borrower's default under the terms of the loan described above;

5. This agreement is expressly intended for the benefit and protection of Bank and all subsequent holders of the note described above. Borrower warrants and represents that Borrower owns the above-described real property."

alone, but whether the pleaded meaning is one to which the instrument is reasonably susceptible. [Citations.] It is essentially the question that would be presented had defendants denied that the parties intended to create a security interest and plaintiff had offered extrinsic evidence to prove that they did. Such evidence would be admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible. [Citations.] [Par.] The instrument restricts the rights of the Enrights [defendants] in dealing with their property for plaintiff's benefit; it describes itself as 'For use with Property Improvement Loan,' it specifically sets forth the property it covers, and it authorizes plaintiff to record it. These provisions afford some indication that the parties intended to create a security interest and are clearly sufficient to support the pleaded meaning." (*Coast Bank* v. *Minderhout, supra,* 61 Cal.2d 311, 315.)

Of the four factors mentioned by the court in *Coast Bank* as indicating that the parties intended the instrument to create a security interest, only the second is absent in the case now before us. In addition, the Assignment contains an assignment of rents, a provision typically found in deeds of trust. It is beyond dispute that the Assignment could reasonably have been interpreted as creating a security interest and giving rise to an equitable mortgage. Therefore, the extrinsic evidence had probative value supportive of the finding and conclusion of the trial court.

Despite this compelling similarity between the *Coast Bank* instrument and the Assignment in the instant case (see fn. 5, *ante*) the majority simply close their eyes to the rationale of this court in *Coast Bank* and conclude that the Assignment cannot be interpreted as creating a security interest. It seems beyond argument that if the document in one case could be interpreted as creating a security interest, the strikingly similar document in the other case should be susceptible of the same interpretation. It is indeed a strange and ironic process of ratiocination by which the majority opinion professes to regard *Coast Bank* as precedent, gives no intimation of overruling it, but nevertheless declines to pay it any respect.

The basic error which infects the majority's treatment of the crucial question before us lies in the fact that the majority preoccupy themselves with only the language of the Assignment itself. But as *Thomas Drayage* makes clear, the court should consider "all credible evidence offered to prove the intention of the parties. [Citation.] Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.]" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 39-40.)

Not only do the majority adopt this restrictive approach to the problem at hand; they actually misconceive the scope of our review in dealing with it. Our first task is not to interpret the Assignment; it is rather to determine whether the extrinsic evidence in the record shows a meaning to which the Assignment is reasonably susceptible.

Persisting in this erroneous approach to the problem, the majority argue that the Assignment is ambiguous and that the bank as the allegedly more sophisticated party, having selected the Assignment from one of its own standardized forms, should not now be allowed to take advantage of its ambiguities. This argument is completely irrelevant to the question before us and reflects the majority's basic misunderstanding of the rule established in *Thomas Drayage*. The real question is not whether a document is ambiguous, but rather whether in the light of all the evidence the document is reasonably susceptible of more than one meaning, including the meaning shown by the extrinsic evidence. "Extrinsic evidence has often been admitted in such cases on the stated ground that the contract was ambiguous [citation]. This statement of the rule is harmless if it is kept in mind that the ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 40, fn. 8.)

The rule that an instrument is to be interpreted against the drafter and the cases relied upon by the majority in invoking it (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168]; *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284]) are inapposite. The citation of those cases by the majority graphically illustrates their misconception of the issue in this case. *Gray* and *Stevens* apply to the construction of a contract when no extrinsic evidence has been introduced to show the actual intent of the parties. We are concerned here only with the question of whether the extrinsic evidence of this case supports the trial court's finding that the parties intended Mrs. Phillips' property to be security for the loan. The rule enunciated in *Gray* and *Stevens* is irrelevant to that consideration.

The majority also argue that the third covenant of the Assignment is inconsistent with an instrument creating a lien upon real property. They, therefore, conclude that the Assignment is not reasonably susceptible of the interpretation that it created a security interest. But an identical covenant appeared in the instrument involved in the *Coast Bank* case (see fn. 2, *supra*) and we there held unanimously that despite such provision the instrument in that case was reasonably susceptible of the interpretation that it created a security interest.

The majority attempt to attenuate the impact of the use of the word

"security" in the preamble of the Assignment. To be sure, the mere use of that word is not an overwhelming indication that the parties intended the instrument to create a lien on real property. Similarly, use of the subtitle "For use with Property Improvement Loan" in the *Coast Bank* instrument was not an overwhelming indication of the similar conclusion reached in that case. However, the standard of reasonable susceptibility is one easily met. (*Coast Bank* v. *Minderhout, supra,* 61 Cal.2d 311; *Delta Dynamics, Inc.* v. *Arioto, supra,* 69 Cal.2d 525; *Hulse* v. *Juillard Fancy Food Co.* (1964) 61 Cal.2d 571 [39 Cal.Rptr. 529, 394 P.2d 65].)

The attempt by the majority to distinguish *Coast Bank* on its facts is equally unpersuasive. They first observe that in *Coast Bank* the agreement provided for an acceleration of the note in the event of a breach of the agreement. (*Ante* at p. 20.) While it is true that the agreement in *Coast Bank* contained an acceleration clause whereas the Assignment before us does not, the court in *Coast Bank* did not find the acceleration clause to be a significant, much less essential, circumstance in concluding that the agreement created a lien on real property. The absence of such a clause in the instant case is also without significance.

Secondly, much is sought to be made of the fact that the agreement in *Coast Bank* contained the subtitle "For use with Property Improvement Loan," (*ante* at p. 20), whereas the Assignment before us does not. But despite its subtitle, the agreement in the *Coast Bank* case secured all previous and future debts owed to the bank. Here, the Assignment did not contain the subtitle, but it did state that it was "security for a loan" and the proceeds of that loan were used in purchasing other real estate. When the titles of the two agreements are considered side by side (see fn. 5, *ante*) and read in a common-sense manner, the point raised by the majority indeed seems trivial at best.

Finally, we are urged to distinguish *Coast Bank* on the basis that the defendant in that case breached the agreement by conveying the property. (*Ante* at pp. 20-21.) However, in the instant case, defendant has also breached the Assignment by declaring a homestead on her property. A declaration of homestead is neither a conveyance nor an encumbrance for other purposes (see *ante* at p. 21, fn. 14), but it does exempt the property from execution or forced sale. (Civ. Code, § 1240.) Since the purpose of an agreement not to encumber is, as the majority acknowledge, to acquire a "guarantee that property in which the debtor has an equity will remain unencumbered and unconveyed, *and thus available for levy and execution* should the creditor reduce his debt to judgment," (italics added) (*ante* at p. 17) a declaration of homestead on such property effectively frustrates the clear purpose of the agreement. Therefore, in this situation

a declaration of homestead must be deemed tantamount to an encumbrance or other disposition of the property and thus a breach of the agreement.

But even assuming arguendo that defendant did not breach the Assignment, that fact, coming as it did, long after the execution of the document can throw little, if any, light on the reasonableness of its interpretation. The breach of the Assignment is relevant on the issue whether an equitable mortgage should be declared as an exercise of the discretion of a court of equity; it is not relevant on the issue whether the Assignment is reasonably susceptible to the interpretation given it by the trial court.

In sum, the majority's labored attempts to distinguish *Coast Bank*—a well-considered and unanimous opinion of this court—are totally ineffective. It remains compelling authority for the proposition that the Assignment in this case was reasonably susceptible of the interpretation shown by the extrinsic evidence. The conclusion is ineluctable that the extrinsic evidence admitted below was not violative of the parol evidence rule.

The remaining inquiry is practically routine: whether, considering the extrinsic evidence and all other evidence in the case, the finding and conclusion of the trial court were adequately supported. As we recently stated in *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 294 [74 Cal.Rptr. 521, 449 P.2d 737]: "However, in truth a realistic interpretation of these documents 'turns upon the credibility of extrinsic evidence' [citation], and where, as here, such evidence is in conflict, the findings made by the trier of the fact are binding upon appellate review." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825].)

Here, as already pointed out, Ross testified that "[b]ased on further discussion and asking for a collateral, it was proposed and accepted [by both parties] that the house . . . would be put up as collateral. . . ." and that he took the Assignment "knowing it was in actuality a mortgage instrument against the house."

Defendant's testimony, on the other hand, was that she did not intend to sign, nor did she believe she was signing, any type of security interest on her property. She stated that at the time the Assignment was executed she believed that she lacked the power to create a security interest in the entire parcel, since she owned an undivided one-half interest individually and the other one-half as trustee under a testamentary trust. Clearly, the extrinsic evidence was in conflict. The trial court chose to believe Ross rather than defendant.

The majority now choose to ignore an elementary principle of appellate review which forbids this court to weigh the evidence or determine the

credibility of the witnesses. Like it or not, the majority are bound by the trial court's determination of these matters. "It is not our province to weigh the evidence nor to determine the credibility of the witnesses, but only to decide whether the evidence, as matter of law, supports the findings." (*Southern Cal. Co.* v. *Amalgamated Assn.* (1921) 186 Cal. 604, 618 [200 P. 1].)

Ross' testimony amply supports the trial court's finding that both parties intended and agreed that Mrs. Phillips' property was to be security for the loan. To this finding, the trial court properly applied the controlling principle of law—that "[a]n agreement that particular property is security for a debt also gives rise to an equitable mortgage even though it does not constitute a legal mortgage" (*Coast Bank* v. *Minderhout, supra,* 61 Cal.2d 311, 314)—to reach the unimpeachable conclusion that the Assignment created an equitable mortgage. Thus, the finding and the conclusion are amply supported by Ross' testimony. Having found substantial evidence in support of the findings our function as an appellate court ends and we must affirm the judgment. (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].)

I would affirm the judgment.