Filed 3/20/26  The Law Firm of Fox and Fox v. Arteaga CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE LAW FIRM OF FOX AND FOX, | B341820 |
| Plaintiff and Respondent, | (Los Angeles County Super. CT. No. 22STCV21229) |
| v. | |
| MIGUEL ARTEAGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas D. Long, Judge.  Affirmed.

Bruce J. Guttman; Brent Law and Karen K. Brent for Defendant and Appellant.

Frank O. Fox for Plaintiff and Respondent.

A dispute arose between plaintiff/respondent the Law Firm of Fox and Fox (the firm) and defendant/appellant Miguel Arteaga[1] over fees owed to the firm from Attorney Frank Fox's representation of Miguel in his divorce and restraining order proceedings.[2] A jury found in favor of the firm, holding Miguel liable for $21,187.67. Miguel's motions for judgment notwithstanding the verdict (JNOV) and for a new trial were denied and, after judgment was entered in favor of the firm, he appealed.

Miguel contends the trial court erroneously denied the motion for JNOV because the retainer agreement he signed was unconscionable. He additionally argues the court should have granted his motion for a new trial because Fox committed misconduct and the damages awarded were excessive. We are not persuaded by Miguel's arguments and affirm the judgment.

## FACTS

### I. *Miguel Arteaga*

A. *The Retainer Agreement*

On September 29, 2021, Miguel met with Fox and retained the firm to represent him in his divorce proceedings as well Zamara's related request for a restraining order against him. The firm represented Miguel until June 14, 2022.

Miguel only had "a few" questions before signing the retainer agreement and all his questions were answered to his

---

[1] Miguel Arteaga was married to Zamara Arteaga. Because they share the same surname we will refer to them by their first names.

[2] Frank Fox (Fox) represented the firm at trial. Miguel was represented by Bruce Guttman (Guttman). For clarity, we occasionally make direct reference to each attorney.

satisfaction. Miguel agreed to Fox's billing rate of $500 per hour, an initial retainer of $7,500, and a client deposit of $750 for costs. Miguel initialed each page of the agreement and did not ask Fox to clarify any of its provisions. Nor was there any occasion after he signed the agreement that he asked any question about the agreement or complained about any of its terms.

The agreement contained a provision that allowed the client to "request a change in the terms of th[e] [a]greement," "warrants that he or she has adequate time to reflect on the terms of th[e] [a]greement," and "states that he/she enters into this [a]greement freely and voluntarily and after mature consideration of all the terms of this [a]greement."

The agreement required the client to communicate any inaccuracies in billing statements within 60 days of the bill but Miguel was not familiar with that provision and did not read it. Miguel received bills in March, May, and June of 2022. Miguel paid the first bill in full but sent Fox an email expressing surprise that he had been charged for every call he made to the firm. He did not pay the second or third bills.

Miguel made a total of three payments: $5,000 toward the retainer on September 29, 2021; $3,250 for the balance of the retainer on October 1, 2021; and $10,200[3] for the March invoice on April 9, 2022. He was not initially given credit for the payment of $10,200 but ultimately received the credit as reflected in an April 2024 invoice.

Miguel admitted he never communicated to the firm, in writing or verbally, any objection to the amounts in the billing statements.

---

[3] In the trial court, this payment was also referenced as a payment of $10,148.68 rather than $10,200.

B. *The Restraining Order and Divorce Proceedings*

On August 13, 2021, Zamara filed a request for a restraining order against Miguel and sought to preclude Miguel from having any visitation with their two children. On August 26, 2021, Zamara filed for divorce.

The hearing on the restraining order was set for October 8, 2021, just nine days after the firm was retained. Fox prepared a supplemental response to the request for the restraining order and reviewed with Miguel the questions that he would likely be asked at the hearing.

After the supplemental response was filed, Fox negotiated a settlement with opposing counsel. Miguel signed the settlement agreement; it provided him with weekend visitation rights and included half of the holidays. When asked if he was "very pleased," with the result Miguel testified, "Yes. It's my kids. Of course." On November 3, 2021, Miguel sent an email to Fox in which he stated, "I want to thank you for the great work your [*sic*] doing."

Approximately two months after the settlement, Zamara filed a request to have Miguel removed from the house, to be compelled to provide an accounting for a stimulus refund he received, and to pay child support. Fox prepared an opposition and argued the matter. On April 1, 2022, the court denied the requests for removal and an accounting. The issue of spousal support was continued to another date.

Miguel expressed concern to Fox that Zamara was taking money out of a joint account. Because Miguel was unable to locate the missing money or determine whether she spent it, Fox prepared written discovery on the topic including, among other things, a request that she complete a schedule of assets.

4

The assets disclosed as a result of the discovery were of no surprise to Miguel; he was aware of all of them. When Miguel said Zamara may have given money to one of her relatives, Fox provided Miguel with the option of serving discovery requests on the relative and/or taking Zamara's deposition. Fox told Miguel there was nothing else he could do to pursue the suspected missing money and, through his assistant, gave Miguel a list of private investigators. Miguel thought Fox should have "tried harder" to locate the missing funds; in his opinion, Fox should have hired the private investigator rather than providing him with a list of candidates.

Miguel ultimately hired a private investigator to research whether Zamara had hidden assets. The investigator was not able locate any undisclosed assets.

On June 6, 2022, Zamara filed another request for a restraining order. Fox sent it to Miguel on June 13, 2022, but Miguel did not respond nor did he respond to telephone messages from Fox's office asking Miguel to contact him in order to prepare a response. Instead, he sent a June 13, 2022 letter of termination and ultimately signed a substitution of attorney form naming Angela Swan as his new attorney.

Miguel terminated the firm because (1) there was a "lack of communication" from Fox,[4] (2) Fox missed a June 8, 2022, court appearance, (3) Fox was not able to locate Zamara's hidden money, (4) Miguel was charged for a March 9, 2022 meeting that did not occur, and (5) Miguel wanted to find a less expensive

---

[4] The only email he could remember that was not responded to by Fox was sent on May 5, 2022 wherein he advised Fox of an interview he had with detectives.

attorney. Miguel admitted Fox "was doing pretty good" up until he missed the June 8, 2022 court date.

## II. *Frank Fox*

### A. *Billings and Payments Received*

On September 29, 2021, Miguel visited the firm and spoke with Fox. Fox provided Miguel with a retainer agreement. They discussed the terms including the hourly rate, the scope of the representation, the retainer amount, and the costs deposit. The agreement indicated a 10 percent fee would be charged for late payments. Miguel asked how the rates were charged and Fox explained it was for "any of the time that was spent on his case." Miguel also sought assurance that the representation included opposing the pending request for a restraining order, with a hearing in nine days. Fox asked Miguel to read the agreement and then left the room to allow Miguel to take his time with the document. After approximately 15 minutes, Fox returned to find that Miguel had signed the agreement and initialed all the pages.

All of Miguel's questions were answered before he signed the agreement; he did not have any issues with any of the terms. Nor did he question any of the terms at any time after the agreement was executed. Miguel paid $5,000 toward the retainer before leaving the office.

On October 1, 2021, Miguel visited the firm to drop off the balance owed on the retainer —$3,250. Fox and Miguel discussed the supplemental opposition to the restraining order prepared by Fox; after some modifications, it was signed by Miguel.

Due to the press of business, the first billing statement was not issued until March 7, 2022. On September 9, 2022, Miguel paid the invoice amount of $10,148.68. The second bill (May 25, 2022) and third bill (June 9, 2022) were not paid. Miguel never

6

said why he did not pay the bills. He did not mention that any of the statements incorrectly reflected the date of a meeting he had with Fox.

Miguel was credited $10,148.68 on April 9, 2022, but due to an oversight the credit did not appear on the second or third billing statements. Fox discovered the error in April 2024 when preparing for trial and immediately adjusted the current invoice to reflect what was owed. The mistake was not an issue that Miguel or Guttman brought to his attention. As of April 26, 2024, Miguel had an unpaid balance of $21,187.67.

The only comment Miguel made to Fox regarding the bills was that he believed the first bill was high. He did not express concerns with any of the charges or ask any questions about the billings.

B. *Attorney Services Provided*

Miguel's case presented multiple issues for Fox. Zamara sought to: (1) preclude Miguel from visiting with their teenaged children; (2) require Miguel move out of their residence; (3) have Miguel account for all monies she claimed he had taken, and to return those funds; and (4) force Miguel to disclose all of his assets in his possession, noting he had taken her name off of one of the bank accounts.

Zamara's request for a restraining order was calendared for nine days after he was retained. Fox filed a motion to disqualify the judge pursuant to Code of Civil Procedure section 170.6 because, based on prior experience, he believed she "tends to be favorable towards women when it comes to both visitation matters and restraining order matters." As a result of the disqualification, the hearing was continued.

7

After the continuance, Fox reached an agreement with Zamara's attorney that granted Miguel joint custody of the children and provided him with visitation rights that included half of the holidays. Miguel was "very happy" with the result and sent Fox an email expressing his appreciation.

Zamara then filed a request for an accounting, child support, and removal of Miguel from the residence. Fox prepared a responsive pleading and appeared in court on April 1, 2022. The court denied the request to remove Miguel from the home and for an accounting; it continued the request for child support.

The April 1, 2022 hearing was a virtual appearance such that Fox and Miguel were both on the telephone and heard the clerk say the hearing on child support was continued to June 28. Fox ultimately received notice from the court that the hearing was actually on June 8; neither he nor Miguel appeared as they were under the impression that the hearing was on June 28. Fox "immediately" filed a declaration with the court indicating he heard the court say June 28, wrote June 28 in his notes, and filed a responsive pleading that reflected June 28 as the hearing date. The court set a new date; Miguel suffered no prejudice and Fox was not sanctioned. Miguel never complained about Fox missing the hearing because he missed it as well and heard the same June 28 date that Fox heard.

Both parties had "reimbursement" issues. Miguel believed Zamara had taken money and wanted to know where it was. Zamara sought to have Miguel account for a tax refund and provide her with half of it.

To address Miguel's claim for reimbursement, Fox prepared form and special interrogatories. He also sent a request for production of documents relating to every asset in which Zamara

8

had an interest including but not limited to bank accounts and investments. Fox reviewed Zamara's responses with Miguel whereupon Miguel represented that the responses did not reveal any assets that were unknown to Miguel. Fox conducted additional research into Zamara's potential holdings by utilizing the multiple listing service and a "research program" typically used by private investigators but was unable to uncover any assets not known to Miguel. Fox offered to take Zamara's deposition to further inquire into this issue, but Miguel did not want to incur the corresponding expense.

Fox then subpoenaed Chase bank because Miguel thought, if Zamara had improperly taken funds, Chase bank would have likely been the place she deposited them. But the subpoena did not reveal any other assets. When Miguel suggested Zamara may have given money to a relative, Fox offered to serve discovery requests on the relative. Miguel rejected the idea of conducting discovery on any of his wife's relatives.

Fox provided Miguel with a list of private investigators for Miguel to vet because Fox did not want Miguel to incur the expense of Fox doing the vetting for him. Fox advised Miguel to give the investigator a cap to avoid being subjected to unlimited service and expense.

On June 13, 2022, Fox received a copy of another request for a restraining order filed by Zamara. Fox "immediately" sent a copy to Miguel asking him to contact his office to discuss how to respond to the claims made. Both he and his assistant left messages for Miguel to call Fox because time was of the essence. Miguel did not respond to Fox or his assistant. The following day, Fox received a substitution of counsel form indicating Swan was retained to represent Miguel.

C. *Fox's Communications With Miguel*

Miguel "was very involved in all aspects of the litigation." Fox and Miguel "regularly communicated." Miguel was free to email Fox whenever he wanted but he often chose to speak with Fox's assistant because Fox did not charge for those communications. Fox copied Miguel on every email he sent to opposing counsel and forwarded every email he received from opposing counsel to Miguel at no charge.

Fox explained the communications with Miguel and the corresponding hours billed in the following way. Over the course of nine months that Fox represented Miguel, Fox had three in-person meetings that lasted a total of 4.25 hours, spoke with Miguel over the phone on 17 occasions for a total of 2.8 hours, sent 11 emails to Miguel for a total of 4 hours, and received 40 emails from Miguel for a total of 7.3 hours.

The May 5, 2022 email Miguel identified as the one Fox ignored did not call for a response. Rather it simply informed Fox that Miguel was questioned by the police about an allegation that he harmed his wife and stated, "everything is okay." It did not ask Fox to take any action or make any inquiry. Fox saw no need to generate an additional fee by responding to the email.

On one occasion (December 7, 2021) Miguel sent an email complaining about the absence of a response to messages left with Fox's assistant. These were instances where Miguel inquired about whether there were any updates on his case and was informed that there were no updates to report. Fox was never advised that Miguel wanted Fox to contact him. When Fox received the 12:15 p.m. email, he responded by email at 1:22 p.m. Fox apologized for not receiving his messages, told him there

10

were no updates on his case, and provided a phone number Miguel could call to reach him directly.

Miguel's reasons for substituting Fox out of the case were never raised with Fox. He never said he wanted a less expensive attorney. Other than on December 7, 2021, Miguel never complained that Fox failed to return a call. Miguel did not complain about being billed for a meeting on an incorrect date. He did not express unhappiness that Fox was unable locate Zamora's hidden funds; he was frustrated because he was hoping the funds existed somewhere. Miguel had no issue with reviewing the list of investigators himself and hiring one of them without involving Fox.

## DISCUSSION

### I. *Background*

Prior to trial, the parties briefed the issue of whether the unconscionability of the retainer agreement should be decided by the court or the jury. The court decided the jury would determine the truth of "subsidiary facts" related to unconscionability, but it would rule on whether the retainer agreement was in fact unconscionable. The court advised the attorneys, "[W]e may have to have a separate argument, when the verdict comes back, as to why I should find, based on the jury's advisory verdict or based on my own fact findings, why I should find that the contract is either enforceable and not unconscionable or unenforceable and unconscionable, and you will be free to make that argument to me as well at the end."

In this regard, the jury was tasked with making factual findings by answering the following questions: (1) "Did you find provisions of the contract between [p]laintiff, Fox and Fox and [d]efendant, Miguel Arteaga, to be harsh, one sided, or unfair in

11

favor of Fox and Fox and against Miguel Arteaga?" (2) "Did you find that Fox and Fox failed to disclose material facts to Miguel Arteaga at the time the contract was entered into?" (3) Did you find the amount of fees charged to be reasonable in proportion to the value of the services performed?" (4) "Did Miguel Arteaga give informed consent for the fees incurred by [p]laintiff? (5) "Was the time spent by [p]laintiff appropriate for the work performed on behalf of Miguel Arteaga?" Questions (1) and (2) were answered, "No"; the remaining questions were answered "Yes."

Miguel filed a motion for JNOV and, alternatively, for a new trial. He argued JNOV should be granted because the retainer agreement was unconscionable and because the jury's monetary award was contrary to the evidence.[5] Miguel supported his new trial motion with arguments that opposing counsel engaged in misconduct (questioning Miguel about whether one of Zamara's requests for a restraining order accused him of hiring a coworker to kill her and their children), the trial court improperly responded to a jury question,[6] and "other irregularities" (the absence of a basis for the 10 percent late fee) resulted in

_____

[5] On appeal, Miguel does not contend the JNOV should have been granted on the ground that the jury's monetary award was contrary to the evidence.

[6] Although a topic heading in Miguel's opening brief states "the error related to the juror question" was among the reasons warranting a new trial, Miguel offers no argument on this point and, for that reason, we do not address it. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [claims unsupported by reasoned argument and authority are forfeited]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [appellate court is not required to examine undeveloped claims or make arguments for parties].)

excessive damages and an unsupported verdict.  The firm filed an opposition, and Miguel filed a reply to the opposition.

The trial court issued a written minute order explaining its denial of the motions.  In denying the motion for JNOV, the trial court agreed with, and adopted, the jury's factual findings.  The court also acknowledged a severability clause in the retainer agreement and then wrote, "The purported unconscionable provisions were not at issue in this action.  Rather, this was a simple case of unpaid fees."

Turning to the new trial motion, the court noted the parties stipulated to the admissibility of the restraining order at issue but nonetheless, at trial, the court struck it and instructed the jury that it shall not consider any evidence concerning Zamara's allegations that Miguel solicited a coworker to kill Zamara and their children.  In rejecting Miguel's argument, the court presumed the jury followed the instruction and stated "an adverse verdict alone is not evidence of prejudice."  The court found the 10 percent late fee was supported by language in the retainer agreement.  The new trial motion was denied.

## II.  *JNOV/Unconscionability*

### A.  *Standard of Review*

Whether a contractual provision is unconscionable is a question of law.  (*Fisher v. MoneyGram Internat., Inc.* (2021) 66 Cal.App.5th 1084, 1094; *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1316.)  Because Miguel challenges the denial of a judgment notwithstanding the verdict on a purely legal question our review is de novo.  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

13

B. *Analysis*

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. . . . [The] unconscionability doctrine "'has both a procedural and a substantive element.'" [Citation.] 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.'" (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125.) "Both procedural and substantive unconscionability must be shown for the defense to be established, but 'they need not be present in the same degree.'" (*Ibid.*) "[T]hey are evaluated on "'a sliding scale.'"" (*Ibid.*)

Under Civil Code section 1670.5, once a trial court has determined that a contract or any of its clauses is unconscionable, it may "do one of the following: (1) refuse to enforce the contract; (2) sever any unconscionable clause; or (3) limit the application of any clause to avoid unconscionable results." (*Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 513; see § 1670.5, subd. (a).) "The 'strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement.'" (*Id.*, at p. 513.) Accordingly, the court has discretion not to sever, and to thus refuse to enforce the entire agreement, "'only when an agreement is "permeated" by unconscionability.'" (*Ibid.*; see also *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 122.)

14

Miguel argues the trial court should have found the contract unenforceable based on what he alleges are unconscionable provisions.  They include:  (1) waiving the applicability of the Supreme Court's holding in *Trope v. Katz* (1995) 11 Cal.4th 274, 278 (*Trope*) that an attorney-litigant who proceeds in pro. per. rather than retaining another attorney may not recover reasonable attorney fees under Civil Code section 1717; (2) permitting Miguel's $7,500 retainer and $750 costs advance to be deposited into the firm's general bank account as opposed to the client's trust account in violation of State Bar Rules of Professional Conduct, rule 1.15(a);[7] (3) permitting the firm to retain the benefits of awards for sanctions and attorney fees but requiring Miguel to make those payments should the court impose them against Miguel; (4) requiring Miguel to pay for the costs of filing and pursuing arbitration regarding disputes over the payment of attorney fees; (5) waiving Miguel's right to challenge bills if more than 60 days has passed from the date of the billing statement; (6) imposing a 10 percent late charge without an explanation of how the charge is calculated.

We first address, and summarily reject, the first five arguments for unconscionability because, even if unconscionable, none of the provisions permeated the agreement in such a way as to render it entirely unenforceable.

---

[7]     Further references to rules are to the State Bar Rules of Professional Conduct.  Rule 1.15(a) requires funds received by a lawyer for the benefit of a client to be deposited in a trust account.  Miguel's unopposed request for judicial notice of rule 1.15 is granted.  (Evid. Code, § 451, subd. (c).)

--The jury was not faced with deciding whether the *Trope* waiver applied to the recovery of attorney fees related to the action.

--Whether Miguel's retainer and costs deposit were properly deposited into a trust account was irrelevant to his contractual duty to pay fees.

--There was no evidence that sanctions were imposed in the underlying dissolution/restraining order matter or that Miguel was required to either pay sanctions or Zamara's attorney fees.

--The payment of arbitration costs was irrelevant to the case because neither the firm nor Miguel requested arbitration.

--The 60-day timeline within which to challenge the bills was unrelated to the jury's obligation to determine whether Miguel owed the firm fees for reasonable services rendered by Fox.

We wholly agree with the trial court's assessment that these provisions of the retainer agreement were "not at issue in this action" and therefore, even if unconscionable, were properly subject to the legislative prerogative that they be severed from the contract and the remainder of the agreement, i.e., the requirement that Miguel pay for services rendered, remained enforceable.

The 10 percent late fee (or interest payment) was arguably related to the case as such a fee was assessed on overdue charges. Miguel argues the provision is "convoluted" in that "there is no explanation of how the charge is calculated" and that it "confusingly state[d] that the charge is not interest." The provision states that a "LATE CHARGE OF 10% PER ANNUM WILL BE ADDED TO ANY UNPAID BALANCE." After providing a space for Miguel's initials, it continues, "Client

16

understands that late charges are not interest but constitute a reasonable cost for carrying [an] unpaid balance."  We acknowledge the invoices reflect the 10 percent charge as "interest," but we see no meaningful distinction between the fee being charged as a late fee or interest and there was no evidence that Miguel did not understand the fee was imposed because his payment was overdue.[8]  In other words, Miguel has not established the penalty surprised him due to unequal bargaining power or that it was overly harsh.  Although the provision could have been drafted with more clarity, it was a far cry from unconscionable.[9]

## III.  *New Trial Motion*

### A.  *The Accusation*

During Miguel's testimony, Fox asked Miguel whether Zamara, in her June 2022 request for a restraining order, accused him of attempting to hire a coworker to kill her and their children.  The trial court overruled Guttman's objection based on the lack of foundation and hearsay.  Guttman then objected to the line of questioning because the parties had stipulated that the restraining order was in evidence thereby (presumably) rendering the testimony unnecessary.  The court expressed concern about relitigating the divorce case and noted that a curative instruction may be needed to prevent the jury from

---

[8]  The only evidence that Miguel complained about the amount billed was in a March 9, 2022 email to Fox wherein he mentioned he was "shocked that [he] was being charge[d] for ever[y] phone call [he] made to [Fox's] office."

[9]  To the extent Miguel argues his new trial motion should have been granted due to the unconscionability of the retainer agreement, we reject it for the same reasons.

17

considering Zamara's accusations for the truth of the matter stated. It then sustained Guttman's "standing objection" and asked Fox to "move on to another area of questioning."

After the jury was excused for the day, Guttman asked the court for permission to call witnesses to refute Zamara's allegations in the request for a restraining order. The trial court characterized a curative instruction as "sufficient" but tabled the issue of additional defense witness and instructed both parties to prepare a proposed instruction.

The following morning, both parties submitted proposed instructions. The issue of possible defense witnesses regarding Zamara's accusations resurfaced. The court denied Guttman's request to present additional witness, indicating "we're not going to re-litigate the divorce case." After further discussion, the court gave Guttman permission to have the coworker testify for "less than 30 minutes" to deny he was solicited by Miguel and allowed Guttman to question Miguel on the topic.

Guttman then asked the court to strike the request for a restraining order (Exhibit 20).[10] The trial court initially denied Guttman's request and opted to instruct the jury that it may not consider its contents for the truth of the matter asserted. Despite the limiting instruction and the court's willingness to allow additional defense evidence, Guttman moved for a mistrial because the court denied his motion to strike the exhibit.

After further discussion, the court agreed to strike Exhibit 20 and "all reference[s] to [Miguel] hiring someone or trying to hire someone to kill his wife and children…." The court then

---

[10]    Prior to trial both parties stipulated to the admissibility of Exhibit 20.

18

denied the mistrial motion and request to admit other defense evidence on this matter.

Consistent with the court's ruling, the jury was instructed that the claims made by Zamara "were not offered for the truth but offered for the litigation involved in the divorce proceeding and the discord between [Miguel and Zamara]. [¶] Any evidence concerning [Zamara's] claim concerning [Miguel] soliciting his coworker to kill his wife and children shall not be considered by the jury. [¶] We are not here to relitigate the issues in [Miguel]'s divorce proceeding but [to] determine what if any attorney's fees and costs are owed to plaintiff by [Miguel]."

B. *Rules Governing a New Trial Motion*

"A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.)

The trial court's ruling on a motion for new trial will not be disturbed "'unless the record reveals a manifest and unmistakable abuse of discretion.' [Citations.]" (*Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 338–339.) "'A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal. [Citation.] An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] Accordingly, we can reverse the denial of a new trial motion based

19

on insufficiency of the evidence or . . . excessive damages only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted.' [Citation.]" (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415–1416.)

C. *Analysis*

Miguel argues a new trial was warranted because the court's instruction was "ineffective to counteract the prejudice." He claims the instruction must have been futile because the jury decided the case against him despite evidence that (a) the retainer agreement violated rule 1.15, (b) Fox was not truthful, and (c) plaintiff "sought damages in excess of [the] amounts billed."

We begin with the premise that the jury is presumed to follow the court's limiting instructions. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803–804; *Phillips v. Honeywell Internat. Inc.* (2017) 9 Cal.App.5th 1061, 1081.) Miguel attempts to rebut this presumption by asking us to ignore the deference accorded to the trial court, reweigh the evidence, and reach a result that differs from the trial court's ruling. The above cited authority does not permit this sort of review. Rather we look to whether the trial court manifestly abused its discretion because (a) there is no substantial conflict with the evidence relied on by Miguel, and (b) that virtually uncontradicted evidence warrants a new trial. Miguel falls well short of meeting this threshold.

1. *Rule 1.15*

We first observe that, while the JNOV cited a violation of rule 1.15 in support of Miguel's unconscionability argument, it was not cited as a reason for a new trial. Accordingly, Miguel has forfeited the contention. (*Tahoe National Bank v. Phillips* (1971)

20

4 Cal.3d 11, 23, fn. 17; *Miller v. Pacific Gas & Electric Co.* (2023) 97 Cal.App.5th 1161, 1170.)

In any event, Miguel's argument is without merit. When Fox was on the witness stand, he was questioned about whether, pursuant to rule 1.15, he properly deposited money held on behalf of Miguel in a client trust account. It was evident that Guttman and Fox disagreed about the applicability of the rule. The trial court ultimately stopped the back and forth commenting, "The jury is not going to decid[e] this legal question. So let's move on." In other words, the jury was not asked to decide whether any rule violation took place, nor was it instructed on the role any potential rule violation had in its determination of whether Miguel owed the firm money for services performed.

## 2. *The Purported Lies*

Miguel argues he "demonstrated lies by [p]laintiff," but it is not clear what specific falsehoods he is referencing to or how they could have impacted the jury. At one point in the opening brief, in the argument that the court should have granted the motion for a new trial, he contends Fox made a "false accusation, in front of the jury, that [Miguel] tried to have his wife and children killed." In support of this claim, he quotes four questions regarding whether Zamara alleged Miguel made efforts to arrange for someone to kill her and their children:

--"Did your wife claim . . . you had offered money for a coworker to kill her?"

--"Did she claim that you did this three separate times?"

--"Did she also say that you offered this person $60,000 in order to kill her?"

--"Did she also claim that you spoke about killing your children?"

21

The quoted passages from the record do not support Miguel's contention.  Fox asked Miguel whether *Zamara* made the allegations that, on appeal, Miguel alleges were false.  Fox *himself* did not accuse Miguel of attempting to harm Zamara or their children.  Moreover, to the extent Miguel argues the presumption that the jury followed the instruction to disregard any evidence regarding the solicitation for murder is rebutted by the questions regarding solicitation for murder is both circular and unpersuasive.

### 3. *Excessive Damages*

Miguel argues the firm's calculation of $21,187.67 was excessive because, based on its billing, it was only due $19,996.50.  He also claims Fox improperly included a charge of $1,524 for a court appearance on April 1, 2022 (including parking) and $1,000 for a two-hour March 9, 2022 meeting that did not occur.  There are procedural and substantive problems with Miguel's argument.

The motion for new trial included two substantive argument sections which set forth two discrete claims.  The first was that a new trial was warranted because of Fox's questioning of Miguel on the topic of whether Zamara accused him of soliciting murder.  Second, was a three-sentence claim that the court's improper answer to a jury question and other "irregularities" warranted a new trial.  While this claim included a line regarding the absence of a basis for the 10 percent late fee, there is no mention of unsubstantiated charges.

In denying the motion for a new trial, the court addressed the arguments as they were laid out in the motion.  Miguel did not raise the issue of whether overbilling warranted a new trial and the court did not address it.  Because an erroneous

22

calculation of damages was not a ground supporting the motion for a new trial, Miguel has forfeited his corresponding contention on appeal. (*Tahoe National Bank v. Phillips, supra,* 4 Cal.3d at p. 23, fn. 17; *Miller v. Pacific Gas & Electric Co., supra,* 97 Cal.App.5th at p. 1170.)

Even if not forfeited, a new trial was not warranted on this ground. In the section of his pleading addressing the propriety of a JNOV, Miguel asserted the damages were contrary to the evidence because the 10 percent interest ($3,552.23) constituted unenforceable liquidated damages. Miguel concluded, "As a matter of law, [the firm] was not entitled to an award in excess of the principal amount due for hourly time billed and costs at the time of filing this lawsuit—$16,885.14." Not only does this appear to be a concession that the billings were legitimate, we make the following observations that supported the jury's award.

--The April 26, 2024 invoice reflected a balance of $16,885.14 plus interest of $3,552.23 which totals $21,187.67—the precise amount awarded by the jury.

--In response to the firm's request for admissions, Miguel admitted he never communicated to the firm, in writing or verbally, any objection to the amounts in the billing statements.

--On November 3, 2021, Miguel sent an email to Fox in which he stated, "I want to thank you for the great work your [*sic*] doing."

--Miguel testified he thought Fox "was doing pretty good" up until he missed the June 8, 2022 court date.

--Fox testified that, as of April 26, 2024, Miguel owed the firm $21,187.67.

--The billing statements reflected three meetings between Miguel and Fox; although Miguel did not recall the March 9, 2022

meeting, he did not dispute that there were three meetings total or the amount billed for the meetings.

This evidence points to the accuracy of the jury's damage award. There is, at a minimum, evidence in the record that substantially conflicts with that which is cited by Miguel and we can safely say that Miguel's referenced evidence does not "compel[] the conclusion that the motion should have been granted." (*Rayii v. Gatica, supra*, 218 Cal.App.4th at pp. 1415–1416.)

## DISPOSITION

The judgment is affirmed. Plaintiff/respondent is to recover costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KUMAR, J.*

We concur:


MOOR, Acting P. J.


KIM (D.), J.

---

* Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24